**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| EAST TEXAS BAPTIST UNIVERSITY, and HOUSTON BAPTIST UNIVERSITY, | |
| *Plaintiffs*, | |
| v. | Civil No.  12-3009 |
| | **Jury Demanded** |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, THOMAS PEREZ, Secretary of the United States Department of Labor, UNITED STATES DEPARTMENT OF LABOR, JACOB LEW, Secretary of the United States Department of the Treasury, and UNITED STATES DEPARTMENT OF THE TREASURY, | |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT

Come now Plaintiffs East Texas Baptist University and Houston Baptist University, by and through their attorneys, and state as follows:

## NATURE OF THE ACTION

1. This is a challenge to regulations issued under the Patient Protection and Affordable Care Act that force thousands of religious organizations to violate their deepest religious beliefs.

2. Plaintiffs East Texas Baptist University and Houston Baptist University ("the Universities") are Christian liberal arts universities. East Texas Baptist University is located in Marshall, Texas. Houston Baptist University is located in Houston, Texas. The Universities' religious beliefs forbid them from participating in, providing access to, paying for, training others to engage in, or otherwise supporting abortion. The Universities are among the many American religious organizations that hold these beliefs.

3. With full knowledge of these beliefs, the government issued an administrative rule ("the Final Mandate") that runs roughshod over the Universities' religious beliefs, and the beliefs of millions of other Americans by forcing them to provide health insurance coverage for abortifacient drugs and related education and counseling.

4. Following a widespread negative public response to those regulations, including dozens of lawsuits, the government claimed to address the objections of religious organizations like ETBU and HBU. But their efforts were neither convincing nor sufficient.

5. Declaring "we are in war," Defendant Secretary Sebelius has openly mocked those who oppose the regulations, stating "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

6. Secretary Sebelius's statements ignore that the regulations themselves require religious organizations to facilitate access to drugs and devices that cause abortions.

7. Secretary Sebelius has further compared opponents of the Affordable Care Act to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires

2

the same action that was shown "in the fight against lynching and the fight for desegregation."

8. Rather than a willingness to respect the consciences of religious believers, these statements show a blatant disregard for the freedom of religion protected by the First Amendment of the United States Constitution and federal law by clumping religious organizations like ETBU and HBU, who object to providing access to only a small number of drugs and devices, with racist lynch mobs and segregationists.

9. Defendants' claimed "accommodation" for religious organizations would still require the Universities to play a central role in facilitating access to abortion-causing drugs and devices by—among other things—finding and designating a third party administrator to provide abortion-causing drugs and devices on their behalf.

10. The government's Final Mandate, even after a tortuous rulemaking process, unconstitutionally coerces the Universities to violate their deeply-held religious beliefs under threat of heavy fines and penalties. The Mandate also forces the Universities to facilitate government-dictated speech that is incompatible with their own speech and religious teachings. Having to pay a fine to the taxing authorities for the privilege of practicing one's religion or controlling one's own speech is un-American, unprecedented, and flagrantly unconstitutional.

11. Defendants' disregard for the freedom of religion is further manifest in that thousands of organizations employing millions of Americans remain exempt from the regulations *for purely secular reasons*.

12. The government obviously does not believe every single insurance plan in the country needs to cover these services. Rather, the government has provided **thousands** of exemptions from the Affordable Care Act for other groups, including employers with grandfathered plans, employers with under 50 employees, and other favored organizations.

13. According to the United States Small Business Administration, more than 31 million individuals are employed by firms with fewer than 50 employees, accounting for 28.1% of the workforce.

14. Defendants' wrongful refusal to exempt religious organizations therefore violates the Universities' rights to freedom of religion, as secured by the First Amendment of the United States Constitution, the Due Process Clause of the Fifth Amendment, and the Religious Freedom Restoration Act ("RFRA").

15. Defendants' actions also violate the Universities' rights to the freedom of speech, as secured by the First Amendment of the United States Constitution.

16. Furthermore, the Final Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

17. Had the existence of religious objections to abortifacient drugs been obscure or unknown, the government's actions might have been an accident. But because the government acted with full knowledge of those beliefs, and because it allows plans not to cover these services for a wide range of reasons *other than* religion, the Final Mandate can be interpreted as nothing other than a deliberate attack by the government on the religious

beliefs of the Universities and millions of other Americans. The Universities seek declaratory and injunctive relief to protect against this attack.

## JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

19. Venue lies in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this district, and Plaintiff Houston Baptist University is located in this district.

## IDENTIFICATION OF PARTIES

20. Plaintiff East Texas Baptist University is a Christian liberal arts university located in Marshall, Texas. Established in 1912, East Texas Baptist University is committed to offering a complete education that develops students spiritually, intellectually, and professionally.

21. Plaintiff Houston Baptist University is a Christian liberal arts university located in Houston, Texas. Established in 1960, Houston Baptist University is committed to offering a complete education that develops students spiritually, intellectually, and professionally.

22. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the challenged regulations.

23. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Secretary Sebelius is sued in her official capacity only.

24. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the challenged regulations.

25. Defendant Thomas Perez[1] is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor. Secretary Perez is sued in his official capacity only.

26. Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

27. Defendant Jacob Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department. Secretary Lew is sued in his official capacity only.

28. Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

---

[1]     Since the filing of the original complaint, Defendants Thomas Perez and Jacob Lew have automatically been substituted for original Defendants Hilda Solis and Timothy Geithner. Fed. R. Civ. P. 25(d).

## FACTUAL ALLEGATIONS

**I.   The Universities' Religious Beliefs and Practices Related to Insurance for Abortion.**

29. **East Texas Baptist University** is a Christian liberal arts university located in Marshall, Texas. Established in 1912, East Texas Baptist University is committed to offering a complete education that develops students spiritually, intellectually, and professionally.

30. Faith is central to the educational mission of East Texas Baptist University. East Texas Baptist University describes itself as providing "academic excellence while integrating faith with learning," and commits, in its mission, to "Christian stewardship and to providing and maintaining an environment conducive to learning, leadership development, and academic excellence."

31. Consistent with its mission, East Texas Baptist University works to manifest its Christian faith in all aspects of its administration. All East Texas Baptist University employees profess faith in Jesus Christ, which establishes the essential framework within which members of the University both unite in shared beliefs and explore differences.

32. East Texas Baptist University holds religious beliefs that include traditional Christian teachings on the sanctity of life. East Texas Baptist University believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious from the moment of conception. East Texas Baptist University therefore believes and teaches that abortion ends a human life and, with rare exceptions, is a sin.

33. East Texas Baptist University has more than 1,290 graduate and undergraduate students.

34. East Texas Baptist University has approximately 227 full-time and 56 part-time employees.

35. As part of its commitment to Christian education, East Texas Baptist University also promotes the spiritual and physical well-being and health of its students and employees. This includes provision of generous health services and health insurance for its employees.

36. East Texas Baptist University considers artificially preventing implantation of a human embryo to constitute an abortion.

37. The use of artificial means to prevent the implantation of a human embryo in the uterus also constitutes an abortion as that term is used in federal law.

38. Because of its religious convictions concerning the sanctity of life, East Texas Baptist University cannot participate in any scheme to facilitate access to drugs and services that cause abortions.

39. East Texas Baptist University's insurance plans do not cover abortions or abortion-inducing drugs or devices.

40. East Texas Baptist University has no conscientious objection to providing coverage for non-abortion-inducing contraceptive drugs and devices.

41. The plan year for East Texas Baptist University's employee insurance plans begins on January 1 of each year.

42. East Texas Baptist University's employee insurance plan is self-insured.

43. **<u>Houston Baptist University</u>** is a Christian liberal arts university located in Houston, Texas. Established in 1960, Houston Baptist University is committed to offering a complete education that develops students spiritually, intellectually, and professionally.

44. Faith is central to the educational mission of Houston Baptist University. Houston Baptist University describes itself as "dedicated to the development of moral character, the enrichment of spiritual lives, and the perpetuation of growth in Christian ideals," and commits, in its mission, to "provide a learning experience that instills in students a passion for academic, spiritual, and professional excellence as a result of our central confession, 'Jesus Christ is Lord.'"

45. Consistent with its mission, Houston Baptist University works to manifest its Christian faith in all aspects of its administration. All Houston Baptist University employees profess faith in Jesus Christ, which establishes the essential framework within which members of the University both unite in shared beliefs and explore differences.

46. Houston Baptist University holds religious beliefs that include traditional Christian teachings on the sanctity of life. Houston Baptist University believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious, from the moment of conception. Houston Baptist University therefore believes and teaches that abortion ends a human life and, with rare exceptions, is a sin.

47. Houston Baptist University has more than 2,589 graduate and undergraduate students.

48. Houston Baptist University has approximately 355 full-time and 118 part-time employees.

49. As part of its commitment to Christian education, Houston Baptist University also promotes the spiritual and physical well-being and health of its students and employees. This includes provision of generous health services and health insurance for its employees.

50. Houston Baptist University considers artificially preventing implantation of a human embryo to constitute an abortion.

51. The use of artificial means to prevent the implantation of a human embryo in the uterus also constitutes an abortion as that term is used in federal law.

52. Because of its religious convictions concerning the sanctity of life, Houston Baptist University cannot participate in any scheme to facilitate access to drugs and services that cause abortions.

53. Houston Baptist University's insurance plans do not cover abortions or abortion-inducing drugs or devices.

54. Houston Baptist University has no conscientious objection to providing coverage for non-abortion-inducing contraceptive drugs and devices.

55. The plan year for Houston Baptist University's employee insurance plans begins on January 1 of each year.

56. Houston Baptist University participates in a "church plan" under 26 U.S.C. § 414(e).

## II.  The Affordable Care Act and Preventive Care Mandate

57. In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health

10

Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act."

58. The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

59. The Act does not apply equally to all plans.

60. The Act does not apply equally to all insurers.

61. The Act does not apply equally to all individuals.

62. The Act applies differently to employers with fewer than 50 employees, not counting seasonal workers. 26 U.S.C. § 4980H(c)(2)(A).

63. According to the United States Small Business Administration, more than 31 million individuals are employed by firms with fewer than 50 employees, accounting for 28.1% of the workforce. http://www.sba.gov/advocacy/849/12162.

64. The Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.

65. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

## III. The Preventive Care Mandate

66. One of the provisions of the Affordable Care Act mandates that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" must provide coverage for certain preventive care services. 42 U.S.C. § 300gg-13(a).

11

67. The services required to be covered include medications, screenings, and counseling given an "A" or "B" rating by the United States Preventive Services Task Force;[2] immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and women, as to be "provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(1)-(4).

68. The statute specifies that all of these services must be provided without "any cost sharing." 42 U.S.C. § 300gg-13(a).

   The Interim Final Rule

69. On July 19, 2010, HHS, along with the Department of Treasury and the Department of Labor, published an interim final rule under the Affordable Care Act. ("First Interim Final Rule") 75 Fed. Reg. 41726 (2010).[3] The First Interim Final Rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be

---

[2]    The list of services that currently have an "A" or "B" rating include medications like aspirin for preventing cardiovascular disease, vitamin D, and folic acid; screenings for a wide range of conditions such as depression, certain cancers and sexually-transmitted diseases, intimate partner violence, obesity, and osteoporitis; and  various counseling services, including for breastfeeding, sexually-transmitted diseases, smoking, obesity, healthy dieting, cancer, and so forth. *See http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm* (last visited July 18, 2013); *see also* 75 Fed. Reg. 41726, 41740 (2010).

[3]    For ease of reading, references to "HHS" in this Complaint are to all three Departments, unless context indicates otherwise.

published by the Health Resources and Services Administration at a later date. 75 Fed. Reg. 41759 (2010).

70. The First Interim Final Rule was enacted without prior notice of rulemaking or opportunity for public comment, because Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed." 75 Fed. Reg. at 41730.

71. Although Defendants suggested in the First Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id*.

72. Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments. *Id*.

73. In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the First Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

74. The First Interim Final Rule made clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries. 75 Fed. Reg. at 41730.

75. The First Interim Final Rule acknowledged that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees." *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums.")

76. In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population." 75 Fed. Reg. at 41730.

77. After the First Interim Final Rule was issued, a number of groups filed comments warning of the potential conscience implications of requiring religious individuals and groups to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

78. HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services sho*uld* be covered by all health plans as preventative care for women. *See* http://www.hrsa.gov/womensguidelines.

79. In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), Prof. John Santelli, a Senior Fellow at the Guttmacher Institute, the National

14

Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America and Prof. Sara Rosenbaum.

80. No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

81. One year after the First Interim Final Rule was published, on July 19, 2011, the IOM published its recommendations. It recommended that the preventative services include "All Food and Drug Administration approved contraceptive methods [and] sterilization procedures." Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* at 102-10 and Recommendation 5.5 (July 19, 2011).

82. FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices, including IUDs; Plan B, (also known as the "morning-after pill"); and ulipristal, (also known as "Ella" or the "week-after pill"); and other drugs, devices, and procedures. The FDA birth control guide specifically notes that Plan B and Ella may work by preventing "attachment (implantation)" of a fertilized egg to a woman's uterus. *See* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/ FreePublications/UCM282014.pdf.

83. Thirteen days later, on August 1, 2011, HRSA issued guidelines adopting the IOM recommendations in full. *See* http://www.hrsa.gov/womensguidelines.

The "Religious Employers" Exemption

84. On the same day, HHS promulgated an amended interim final rule ("Second Interim Final Rule") which reiterated the Mandate and added a narrow exemption for "religious employer[s]." 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

85. This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623 (emphasis added). The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

86. The fourth of these requirements refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

87. Thus, the "religious employers" exemption was severely limited to formal churches and religious orders that could show their purpose is to inculcate faith and that hire and serve primarily people of their own faith tradition.

88. Although religious organizations like the Universities shared the same religious beliefs and concerns as churches and religious orders, HHS deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a

16

religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. 46621, 46623.

89. Like the First Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

90. Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

91. Upon information and belief, after the Second Interim Final Rule went into effect, over 100,000 comments were submitted opposing the narrow "religious employer" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

92. On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."

The Safe Harbor

93. On February 10, 2012, President Obama held a press conference at which he announced an intention to initiate, at some unspecified future date, a separate rulemaking process that would work toward creating a different insurer-based mandate. This promised mandate would, the President stated, attempt to take into account the kinds of religious objections voiced against the original Mandate contained in the First Interim Final Rule.

94. On that same day—February 10, 2012—the Defendants issued a "guidance bulletin" describing a "Temporary Enforcement Safe Harbor" ("Safe Harbor") from the Mandate. The Safe Harbor applies to "non-exempted, non-grandfathered group health plans established and maintained by non-profit organizations with religious objections to contraceptive coverage (and any health insurance coverage offered in connection with such plans)." Under the Safe Harbor, the Defendants stated that qualifying organizations would not be subject to enforcement of the Second Interim Final Rule "until the first plan year that begins on or after August 1, 2013," provided they meet certain criteria outlined in the guidance bulletin.

95. Those Safe Harbor criteria require an organization to self-certify that (1) it operates as a non-profit; (2) it has not, from February 10, 2012 onward, offered "contraceptive coverage . . . by the group health plan established or maintained by the organization, consistent with any applicable State law, because of the religious beliefs of the organization"; and (3) it has provided (for the first plan year beginning on or after August 1, 2012) a notice to plan participants stating that "[t]he organization that sponsors your groups health plan has certified that it qualifies for a temporary enforcement safe harbor with respect to the Federal requirement to cover contraceptive services without cost sharing," and that "[d]uring this one-year period, coverage under your group health plan will not include coverage of contraceptive services."

96. Despite the safe harbor and HHS' accompanying promises, on February 15, 2012, HHS adopted as final, "without change," the contraception and abortifacient mandate and its

18

narrow "religious employers" exemption. 77 Fed. Reg. 8725, 8727 (published Feb. 15, 2012).

97. While the safe harbor, by its terms, will temporarily protect the Universities from government enforcement of the final Mandate, the Mandate also triggers a right to private enforcement under ERISA which leaves the Universities completely exposed to private suits. [4]

The Advance Notice of Proposed Rulemaking

98. On March 21, 2012, the Defendants published an Advance Notice of Proposed Rulemaking ("ANPRM"). The ANPRM announced the Defendants' intention to create an "accommodation" for non-exempt religious organizations. The ANPRM solicited public comments on structuring the proposed accommodation, and announced the Defendants' intention to finalize an accommodation by the end of the Safe Harbor period. 77 Fed. Reg. 16501, 16503 (2012).

99. HHS essentially conceded that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id.* (emphasis added).

---

[4]     *See* "Guidance on Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code," U.S. DEP'T OF HEALTH & HUMAN SERVS. (Feb. 10, 2012), at 3, *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited October 4, 2012).

100. The ANPRM did not announce any intention to alter the Mandate or its narrow "religious employer" exemption, which were made "final, without change" on February 15, 2012.

101. In vague terms, the ANPRM proposed that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id.*

102. For self-insured plans, the ANPRM suggested that third party plan administrators "assume this responsibility." *Id.*

103. For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id.*

104. "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely reiterating that the ANPRM's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate free access to abortifacient services.

The Notice of Proposed Rulemaking

105. On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456 (published Feb. 6, 2013).

106.   The NPRM proposed two major changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59.

107.   First, it proposed revising the religious employers exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461

108.   Under this proposal a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461.

109.   HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461.

110.   In other words, religious organizations like the Universities that are not formal churches or religious orders would continue to be excluded from the exemption.

111.   Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt religious organizations by making those religious organizations instead force their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

112.   The proposed "accommodation" did not resolve the concerns of religious organizations like the Universities because it continued to force them to deliberately provide health insurance that would trigger access to abortion-inducing drugs and related education and counseling.

21

113.  In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. 8457.

114.  "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871, with religious organizations again essentially unanimously decrying the proposed accommodation as a gross violation of their religious liberty because it would force them to allow their health care plans to serve as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

115.  On April 8, 2013, the same day the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

116.  In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities will be providing coverage to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese will be included in the benefit package.

> *See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at* http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (last visited July 12, 2013).

117.  It is clear from the timing of these remarks that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation."

<u>The Final Mandate</u>

118.  On June 28, 2013, Defendants issued a final rule (the "Final Mandate"), ignoring the objections repeatedly raised by religious organizations and instead continuing to co-opt religious employers into the government's scheme against their conscience. 78 Fed. Reg. 39870.

119.  Under the Final Mandate, the "religious employers" exemption remains limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

120.  All other religious organizations, including East Texas Baptist University and Houston Baptist University, are excluded from the exemption.

121.  The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874.

122.  An organization is eligible for the accommodation if it (1) "opposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

123.  The self-certification must be executed "prior to the beginning of the first plan year to which the accommodation is to apply." 78 Fed. Reg. at 39875.

124.  The Final Rule extends the current safe harbor through the end of 2013. 78 Fed. Reg. at 39889.

125.   Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator. 78 Fed. Reg. at 39875.

126.   By delivering a self-certification to their insurer or third party administrator, the Universities would trigger the insurer's or third party administrator's obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries." 78 Fed. Reg. at 39875-76.

127.   The Universities would have to identify their employees to the insurer and third party administrator for the distinct purpose of facilitating the government's scheme to facilitate free access to contraceptive and abortifacient services.

128.   The insurer's and third party administrator's obligation to make direct payments for contraceptive services and abortion services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. 39876.

129.   Thus, the Universities would have to coordinate with their insurer and third party administrator regarding when they were adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the contraceptive and abortifacient services payment scheme.

130.   Insurers and third party administrators would be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent

possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. at 39876.

131.  This would also require the Universities to coordinate the notices with their insurers and third party administrators.

132.  The insurers and third party administrators would be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.

133.  Any payment or coverage disputes presumably would be resolved under the terms of the Universities' existing plan documents.

134.  Thus, even under the accommodation, the Universities and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to contraceptive and abortifacient services.

135.  Under the accommodation, issuers "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), *or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly*, on the eligible organization." 78 Fed. Reg. at 39896 (emphasis added).

136.  For all other preventive services, including non-contraceptive preventive services for women, only cost-sharing (*i.e.*, out-of-pocket expense) is prohibited. There is no restriction on passing along costs via premiums or other charges.

137.  Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for

issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.

138. On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

139. Nevertheless, even if the payments were—over time—to become cost neutral, it is undisputed that there will be up-front costs for making the payments. *See, e.g.,* 78 Fed. Reg. at 39877-78 (addressing ways insurers can cover up-front costs).

140. Moreover, if cost savings arise that make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

141. HHS suggests that, to maintain cost neutrality, issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." 78 Fed. Reg. at 39877.

142. This encourages issuers to artificially inflate the eligible organization's premiums.

143. Under this methodology—even assuming its legality—the eligible organization would still bear the cost of the required payments for contraceptive and abortifacient services in violation of its conscience, as if the accommodation had never been made.

144. Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is spread across the

issuer's entire risk pool, excluding plans established or maintained by eligible organizations." 78 Fed. Reg. at 39878.

145.   There is no legal authority for forcing third parties to pay for services provided to eligible organizations under the accommodation.

146.   Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers to directly purchase contraceptive and abortifacient services for an eligible organization's plan participants and beneficiaries.

147.   Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

148.   For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations with insured plans from being co-opted as the central cog in the government's scheme to expand access to free contraceptive and abortifacient services.

149.   Religious organizations with self-insured plans managed by a third party administrator would be even more enmeshed in the government's scheme.

150.   Defendants acknowledge "there is no legal obligation for a third party administrator to enter into or remain in a contract with the eligible organization if it objects to any of these responsibilities." 78 Fed. Reg. at 39880.

151.   Thus, the burden remains on the objecting religious organization to find a third party administrator that will agree to providing free access to the same contraceptive and abortifacient services the religious organization cannot directly provide.

152. The Universities' religious beliefs preclude them from soliciting, contracting with, or designating a third party to provide these services.

153. Moreover, the Final Mandate requires that, even if the third party administrator consents, the religious organization—via its self-certification—must expressly designate the third party administrator as "an ERISA section 3(16) plan administrator and claims administrator solely for the purpose of providing payments for contraceptive services for participants and beneficiaries." 78 Fed. Reg. at 39879.

154. The self-certification must specifically notify the third party administrator of its "obligations set forth in the[] final regulations, and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." 78 Fed. Reg. at 39879.

155. Because the designation makes the third party administrator a plan administrator with fiduciary duties, the payments for contraceptive and abortifacient services would be payments made under the objecting religious organization's plan.

156. Because the Universities would be required to identify and designate a third party administrator or an issuer willing to administer the contraceptive and abortifacient services, the Universities' religious beliefs preclude them from complying with the accommodation.

157. The Final Rule sets forth complex means through which a third party administrator may seek to recover its costs incurred in making payments for contraceptive and abortifacient services.

158.  The third party administrator must identify an issuer who participates in the federal exchanges established under the Affordable Care Act and would be willing to make payments on behalf of the third party administrator.

159.  Cooperating issuers would then be authorized to obtain refunds from the user fees they have paid to participate in the federal exchange as a means of being reimbursed for making payments for contraceptive and abortifacient services on behalf of the third party administrator.

160.  Issuers would be required to pay a portion of the refund back to the third party administrator to compensate it for any administrative expenses it has incurred.

161.  Despite the extreme machinations employed to shift the *cost* of the Final Mandate, the procedures are severely flawed.

162. There is no way to ensure that the cost of administering the abortifacient services would not be passed down to the Universities through premiums and fees.

163.  Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees. *See* 78 Fed. Reg. at 15412; 31 U.S.C. § 9701.

164.  In sum, for both insured and self-insured organizations, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to contraceptive and abortifacient services.

165.  In all instances, the religious organization's decision to offer health insurance and its self-certification serve as the trigger for creating access to free contraceptive and abortifacient services.

166.  The Universities cannot participate in or facilitate the government's scheme in this manner without violating their religious convictions.

The Universities' Religious Objections

167.  The Universities will be subject to enforcement action by Defendants under the Final Mandate no later than January 1, 2014.

168.  On January 1, 2014, the Universities will face an unconscionable choice: either violate the law, or violate their faith.

169.  Although the Universities have no objection to including free coverage for non-abortifacient contraceptive services, their religious convictions forbid them from including free coverage for abortifacient services in their employee healthcare plans.

170.  The Universities' religious convictions equally forbid them from designating a third party administrator as a plan administrator with obligations to provide free access to abortifacient services.

171.  The Universities' religious convictions equally forbid them from designating a plan issuer to provide free access to abortifacient services.

172.  From the Universities' perspective, forcing their insurance issuer or third party administrator to provide free access to abortifacient services is no different than directly providing that access.

173.  The Universities' religious convictions forbid them from participating in any way in the government's scheme to provide free access to abortifacient services through their health care plans.

174.  East Texas Baptist University is not eligible for the religious employers exemption because it is not an organization "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. 46621, 46626.

175.  Houston Baptist University is not eligible for the religious employers exemption because it is not an organization "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. 46621, 46626.

176.  East Texas Baptist University's 2014 employee plan does not meet the definition of a "grandfathered" plan.

177.  Houston Baptist University's 2014 employee plan does not meet the definition of a "grandfathered" plan.

178.  Because the Universities refuse to comply with the Final Mandate and refuse to force their insurer or third party administrator to carry out the Final Mandate by submitting a self-certification, they face crippling fines of $100 each day, "for each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

179.  Dropping their insurance plans would place them at a severe competitive disadvantage in their efforts to recruit and retain employees and students.

180.  The Universities would also face crippling fines of $2000 per year for each of their employees for dropping their insurance plans.

181.  Although the government has recently announced that it will postpone implementing the annual fine of $2000 per employee for organizations that drop their insurance altogether, the postponement is only for one year, until 2015.

182.  The Universities' Christian faith compels them to promote the spiritual and physical well-being of their students and employees by providing them with generous health services.

183.  The Final Mandate forces the Universities to violate their religious beliefs or incur substantial fines for either excluding objectionable coverage without self-certifying or terminating their employee health insurance coverage altogether.

184.  The Final Mandate forces the Universities to deliberately provide health insurance that would facilitate free access to emergency contraceptives, including Plan B and ella, regardless of the ability of insured persons to obtain these drugs from other sources.

185.  The Final Mandate forces the Universities to facilitate government-dictated education and counseling concerning abortion that directly conflicts with its religious beliefs and teachings.

186.  Facilitating this government-dictated speech directly undermines the express speech and messages concerning the sanctity of life that the Universities seek to convey to their students and employees.

The Lack of a Compelling Government Interest

187.  The government lacks any compelling interest in coercing the Universities to facilitate access to abortifacient services.

188.  The required abortifacient drugs, devices, and related services are already widely available at non-prohibitive costs.

189.  The government's willingness to provide access via direct payments from insurance issuers and third party administrators under the supposed accommodation shows it has no compelling interest in providing access through insurance coverage.

190.  There are multiple ways in which the government could provide access without co-opting religious employers and their insurance plans in violation of their religious beliefs.

191.  For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

192.  The government could also simply exempt all religious organizations, just as it has already exempted nonprofit religious employers referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

193.  HHS claims that its "religious employers" exemption does not undermine its compelling interest in making contraceptive and abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or adhere to the same objection, and who

would therefore be less likely than other people to use contraceptive services, even if such services were covered under their plan. 78 Fed. Reg. at 39887.

194.   All of East Texas Baptist University's employees profess faith in Jesus Christ.

195.   All of Houston Baptist University's employees profess faith in Jesus Christ.

196.   Because of the Universities' missions of promoting the sanctity of life and opposing all abortions, including those caused by abortifacient drugs and devices, the Universities' employees are just as likely as employees of exempt organizations to adhere to the same values, and thus are less likely than other people to use the objectionable drugs, devices, and services.

197.   In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010), small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A), and certain religious denominations, 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

198.   These broad exemptions further demonstrate that the government has no compelling interest in refusing to include religious organizations like the Universities within its religious employers exemption.

34

199. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

200. Indeed, HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise. http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html; http://web.archive.org/web/20130620171510/; http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last visited July 22, 2013).

201. According to the United States census, more than 20 million individuals are employed by firms with fewer than 20 employees. http://www.census.gov/econ/smallbus.html.

202. According to the United States Small Business Administration, more than 31 million individuals are employed by firms with fewer than 50 employees, accounting for 28.1% of the workforce. http://www.sba.gov/advocacy/849/12162.

203. The government's recent decision to postpone the employer mandate—i.e., the annual fine of $2000 per employee for not offering any insurance—also demonstrates that there is no compelling interest in coercing universal compliance with the Final Mandate concerning contraceptive and abortifacient services, since employers can now simply drop their insurance without any penalty, at least for one additional year.

204. These broad exemptions also demonstrate that the Final Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

205. The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations also shows that the Final Mandate is not neutral, but rather discriminates against religious organizations because of their religious commitment to promoting the sanctity of life.

206. Indeed, the Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious teachings and beliefs regarding marriage and family.

207. Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

208. On October 5, 2011, six days after the comment period for the First Interim Final Rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."

209. She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much."

210. Secretary Sebelius has further compared opponents of the Affordable Care Act to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation."

211.   Consequently, on information and belief, the Universities allege that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose contraception and abortion.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### Substantial Burden

212.   The Universities incorporate by reference all preceding paragraphs.

213.   The Universities' sincerely held religious beliefs prohibit them from deliberately providing coverage or access to coverage for abortion—inducing drugs or services or related education and counseling. The Universities' compliance with these beliefs is a religious exercise.

214.   The Final Mandate creates government-imposed coercive pressure on the Universities to change or violate their religious beliefs.

215.   The Final Mandate chills the Universities' religious exercise.

216.   The Final Mandate exposes the Universities to substantial fines for their religious exercise.

217.   The Final Mandate exposes the Universities to substantial competitive disadvantages, in that they will no longer be permitted to offer health insurance.

218.   The Final Mandate imposes a substantial burden on the Universities' religious exercise.

219.   The Final Mandate furthers no compelling governmental interest.

220.  The Final Mandate is not narrowly tailored to any compelling governmental interest.

221.  The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

222.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate the Universities' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

223.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT II

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause
Substantial Burden**

224.  The Universities incorporate by reference all preceding paragraphs.

225.  The Universities' sincerely held religious beliefs prohibit them from deliberately providing coverage or access to coverage for abortion or related education and counseling. The Universities' compliance with these beliefs is a religious exercise.

226.  Neither the Affordable Care Act nor the Final Mandate is neutral.

227.  Neither the Affordable Care Act nor the Final Mandate is generally applicable.

228.  Defendants have created categorical exemptions and individualized exemptions to the Mandate.

229.  The Final Mandate furthers no compelling governmental interest.

230.  The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

231. The Final Mandate creates government-imposed coercive pressure on the Universities to change or violate their religious beliefs.

232. The Final Mandate chills the Universities' religious exercise.

233. The Final Mandate exposes the Universities to substantial fines for their religious exercise.

234. The Final Mandate exposes the Universities to substantial competitive disadvantages, in that they will no longer be permitted to offer health insurance.

235. The Final Mandate imposes a substantial burden on the Universities' religious exercise.

236. The Final Mandate is not narrowly tailored to any compelling governmental interest.

237. The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate the Universities' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

238. Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT III

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

239. The Universities incorporate by reference all preceding paragraphs.

240. The Universities' sincerely held religious beliefs prohibit them from deliberately providing coverage or access to coverage for abortion or related education and counseling. The Universities' compliance with these beliefs is a religious exercise.

241.  Despite being informed in detail of these beliefs beforehand, Defendants designed the Final Mandate and the religious employers exemption to the Final Mandate to target religious organizations like the Universities because of their religious beliefs.

242.  Defendants promulgated both the Final Mandate and the religious employers exemption to the Final Mandate in order to suppress the religious exercise of the Universities and others.

243.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Universities' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

244.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

### **COUNT IV**

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause and Establishment Clause
Discrimination Among Religions**

245.  The Universities incorporate by reference all preceding paragraphs.

246.  The Free Exercise Clause and Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

247.  This mandate of equal treatment protects organizations as well as individuals.

248.  By design, Defendants imposed the Final Mandate on some religious organizations but not on others, resulting in discrimination among religions on the basis of religious views or religious status.

249.  The Final Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

250.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Universities' rights secured to them by the First Amendment of the United States Constitution.

251.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

### COUNT V
**Violation of the First Amendment to the United States Constitution
Establishment Clause
Selective Burden/Denominational Preference (*Larson* v. *Valente*)**

252.  The Universities incorporate by reference all preceding paragraphs.

253.  By design, defendants imposed the Final Mandate on some religious organizations but not on others, resulting in a selective burden on the Universities.

254.  The Final Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

255.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate the Universities' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

256.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

### COUNT VI

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause and Establishment Clause
Interference in Matters of Internal Religious Governance**

257.   The Universities incorporate by reference all preceding paragraphs.

258.   The Free Exercise Clause and the Establishment Clause of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions.

259.   They protect the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as those of faith and doctrine.

260.   The Universities have made an internal decision, dictated by their Christian faith, that the health plans available to their employees may not subsidize, provide, or facilitate access to abortifacient drugs, devices, or related services.

261.   The Final Mandate interferes with the Universities' internal decisions concerning their structure by requiring them to subsidize, provide, and facilitate practices that directly conflict with their Christian beliefs.

262.   The Final Mandate's interference with the Universities' internal decisions affects their faith and mission by requiring them to subsidize, provide, and facilitate practices that directly conflict with their  beliefs.

263.   Because the Final Mandate interferes with the Universities' internal decision making in a way that affects its faith and mission, it violates the Free Exercise Clause and the Establishment Clause of the First Amendment.

264.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT VII

**Violation of the First and Fifth Amendments to the United States Constitution**
**Establishment Clause and Due Process**
**Religious Discrimination**

265.  The Universities incorporate by reference all preceding paragraphs.

266.  By design, defendants imposed the Final Mandate on some religious organizations but not on others, resulting in discrimination among religious objectors.

267.  Religious liberty is a fundamental right.

268.  The "religious employer" exemption protects many religious objectors, but not the Universities.

269.  The "accommodation" provides no meaningful protection for the Universities.

270.  The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate the Universities' rights secured to them by the Establishment Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

271.  Absent injunctive and declaratory relief against the Mandate, the Universities have been and will continue to be harmed.

## COUNT VIII

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

272.   The Universities incorporate by reference all preceding paragraphs.

273.   The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

274.   This mandate of equal treatment protects organizations as well as individuals.

275.   The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

276.   The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Universities' rights secured to them by the Fifth Amendment of the United States Constitution.

277.   Absent injunctive and declaratory relief against the Mandate, the Universities have been and will continue to be harmed.

## COUNT IX

**Violation of the First Amendment to the United States Constitution
Freedom of Speech
Compelled Speech**

278.   The Universities incorporate by reference all preceding paragraphs.

279.   The Universities teach that abortion violates their religious beliefs.

280.   The Final Mandate would compel the Universities to facilitate activities that the Universities teach are violations of the Universities' religious beliefs.

44

281.  The Final Mandate would compel the Universities to facilitate access to government-dictated education and counseling related to abortion.

282.  Defendants' actions thus violate the Universities' rights to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

283.  The Final Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

284.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment to the United States Constitution**
**Freedom of Speech**
**Expressive Association**

285.  The Universities incorporates by reference all preceding paragraphs.

286.  The Universities teach that abortion violates their religious beliefs.

287.  The Final Mandate would compel the Universities to facilitate activities that the Universities teach are violations of the Universities' religious beliefs.

288.  The Final Mandate would compel the Universities to facilitate access to government-dictated  education and counseling related to abortion.

289.  Defendants' actions thus violate the Universities' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

290.  Absent injunctive and declaratory relief against the Mandate, the Universities have been and will continue to be harmed.

**COUNT XI**

**Violation of the First Amendment to the United States Constitution
Free Exercise Clause and Freedom of Speech
Unbridled Discretion**

291.   The Universities incorporate by reference all preceding paragraphs.

292.   By stating that HRSA "may" grant an exemption to certain religious groups, the Final Mandate vests HRSA with unbridled discretion over which organizations can have their First Amendment interests accommodated.

293.   Defendants have exercised unbridled discretion in a discriminatory manner by granting an exemption for a narrowly defined group of "religious employers" but not for other religious organizations like the Universities.

294.   Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Final Mandate, despite its conflicts with the free exercise of religion.

295.   Defendants' actions therefore violate the Universities' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

296.   Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

**COUNT XI**

**Violation of the Administrative Procedure Act
Lack of Good Cause and Improper Delegation**

297.   The Universities incorporates by reference all preceding paragraphs.

46

298.  The Affordable Care Act expressly delegates to HRSA, an agency within Defendant HHS, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

299.  Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

300.  Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law. Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

301.  The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

302.  Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

303.   Defendants have never sufficiently explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

304.   Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

305.   Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."

306.   Defendants did not consider or respond to the voluminous comments they received in opposition to the Interim Final Rules or the NPRM.

307.   Therefore, Defendants have taken agency action not in observance with procedures required by law, and the Universities are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

308.   Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT XIII

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Action

309.   The Universities incorporate by reference all preceding paragraphs.

310.   In promulgating the Final Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on the Universities and similar organizations.

311.  Defendants' explanation for its decision not to exempt the Universities and similar religious organizations from the Final Mandate runs counter to the evidence submitted by religious organizations during the comment period.

312.  Defendant Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially conceded that Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.

313.  Thus, Defendants' issuance of the Interim Final Rules and the Final Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

314.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## <u>COUNT XIV</u>

**Violation of the Administrative Procedure Act
Agency Action Without Statutory Authority**

315.  The Universities incorporate by reference all preceding paragraphs.

316.  Defendant's authority to enact regulations under the Affordable Care Act is limited to the authority expressly granted them by Congress.

317.  Defendants lack statutory authority to coerce insurance issuers and third party administrators to pay for contraceptive and abortifacient services for individuals with whom they have no contractual or fiduciary relationship.

318.  Defendants lack statutory authority to prevent insurance issuers and third party administrators from passing on the costs of providing contraceptive and abortifacient services via higher premiums or other charges that are not "cost sharing."

319.  Defendants lack statutory authority to allow user fees from the federal exchanges to be used to purchase contraceptive and abortifacient services for employees not participating in the exchanges.

320.  Because the Final Mandate's "accommodation" for non-exempt, nonprofit religious organizations lacks legal authority, it is arbitrary and capricious and provides no legitimate protection of objecting organizations' First Amendment rights.

321.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## <u>COUNT XIV</u>

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Weldon Amendment**
**Religious Freedom Restoration Act**
**First Amendment to the United States Constitution**

322.  The Universities incorporate by reference all preceding paragraphs.

323.  The Final Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008).

324.  The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human

Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

325.   The Final Mandate requires issuers, including the Universities, to provide coverage or access to coverage of all Federal Drug Administration-approved contraceptives.

326.   Some FDA-approved contraceptives cause abortions.

327.   As set forth above, the Final Mandate violates RFRA and the First Amendment.

328.   Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

329.   Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## COUNT XVI

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Affordable Care Act**

330.   The Universities incorporate by reference all preceding paragraphs.

331.   The Final Mandate is contrary to the provisions of the Affordable Care Act.

332.   Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"— *i.e.*, title I of the Act, which includes the provision dealing with "preventive services"— "shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

51

333.  Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

334.  Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

335.  The Mandate requires issuers, including the Universities, to deliberately provide health insurance that would facilitate access to coverage of all Federal Drug Administration-approved contraceptives.

336.  Some FDA-approved contraceptives cause abortions.

337.  Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

338.  Absent injunctive and declaratory relief against the Final Mandate, the Universities have been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, the Universities request that the Court:

a.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Universities violate the First Amendment of the United States Constitution;

b.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Universities violate the Fifth Amendment of the United States Constitution.

c.  Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Universities violate the Religious Freedom Restoration Act;

d.  Declare that the Final Mandate was issued in violation of the Administrative Procedure Act;

e.  Issue a permanent injunction prohibiting Defendants from enforcing the Final Mandate against the Universities and other organizations that object on religious grounds to facilitating access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling;

f.  Award the Universities the costs of this action and reasonable attorney's fees; and

g.  Award such other and further relief as it deems equitable and just.

## **JURY DEMAND**

The Universities request a trial by jury on all issues so triable.

Respectfully submitted this sixth day of August, 2013.

      s/ *Eric Rassbach*
Eric C. Rassbach (Texas Bar. No. 24013375)
 *Attorney in charge*
 Eric S. Baxter
  *Of Counsel*
  (admitted pro hac vice)
Diana M. Verm
  *Of Counsel*
  (admitted pro hac vice)
The Becket Fund for Religious Liberty
3000 K St. NW, Ste. 220
Washington, DC 20007
Tel.:   (202) 955-0095
Fax:   (202) 955-0090
*erassbach@becketfund.org*
*ebaxter@becketfund.org*
*dverm@becketfund.org*

Scott Keller
  *Of Counsel*
Yetter Coleman LLP
Chase Tower
221 West 6th Street ~ Suite 750
Austin, Texas 78701
*skeller@yettercoleman.com*

*Counsel for Plaintiffs*

54

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2013, the foregoing First Amended Complaint was served on all counsel of record via the Court's electronic case filing (ECF) system.


  /s/ *Eric C. Rassbach*
Eric C. Rassbach