**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

EAST TEXAS BAPTIST UNIVERSITY, *et al.*,§
§
              Plaintiffs,     §
§
VS.                          §      CIVIL ACTION NO. H-12-3009
§
KATHLEEN SEBELIUS, *et al.*,   §
§
              Defendants.    §

**MEMORANDUM AND OPINION**

The Affordable Care Act mandates coverage for contraceptive services in group health plans that employers must provide their employees.  Churches, nonprofit religious organizations, and for-profit corporations owned by deeply religious individuals challenged this mandate as offensive to their religious beliefs.  The federal government responded.  Recent regulations exempt "religious employers," primarily churches, from the mandate; provide an accommodation for nonprofit religious organizations allowing them to avoid direct involvement in providing coverage or paying for contraceptive products or devices they find offensive to their faith; and maintains the mandate for for-profit employers, regardless of their owners' sensibilities.

One set of cases, filed by for-profit employers, is before the Supreme Court.[1]  A second set of cases, filed by nonprofit religious organizations, includes this case.  Both sets of cases present difficult arguments that reflect the pluralistic society we both celebrate and struggle to preserve and protect.

---

[1.] *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013), *cert. granted*, 134 S. Ct. 678 (2013); *Conestoga Wood Specialties Corp. v. Sebelius*, 724 F.3d 377, *cert. granted*, 134 S. Ct. 678 (2013); *see also Gilardi v. U.S. Dep't of Health* & *Human Servs,* 733 F.3d 1208 (D.C. Cir. 2013); *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013).

In this second set of cases, the nonprofit religious organizations contend that the accommodation violates vital protections provided under the Religious Freedom Restoration Act and

the Constitution, by requiring them to facilitate their employees' free access to emergency contraception or face crippling penalties.  The government and an amicus respond that the accommodation sufficiently insulates the organizations from any religiously offensive conduct without stripping thousands of women from free access to emergency-contraceptive services that may be critical to avoiding unwanted pregnancies.  The government and the amicus forcefully argue that an injunction extending the exemption to the plaintiffs would permit them to impose their religious beliefs on their employees who may not share those beliefs by making access to free emergency contraceptives more difficult.

Several district courts have already issued opinions, with inconsistent results.[2]  Because the

---

[2.]  For examples of district courts finding for non-profit plaintiffs on one or more claims, *see e.g., Southern Nazarene University v. Sebelius,* No. 13-cv-1015-F (W.D. Okla. Dec. 23, 2013); *Geneva College v. Sebelius,* No. 12-cv-00207(JCF) (W.D. Pa. Dec. 23 2013); *Legatus v. Sebelius,* No. 12-cv-12061-RHC-MJH (E.D. Mich. Dec. 20, 2013; *Roman Catholic Archbishop of Washington v. Sebelius,* No. 13-cv-1441 (ABJ) (D.D.C. Dec. 20, 2013) (enjoining mandate on "compelled silence" argument; but otherwise denying injunctive relief), emergency motion for expedited briefing for injunction filed Dec. 23 2013, No. 13-5371 (D.C. Cir.); *Reaching Souls Int'l v. Sebelius,* No. 13-cv-01092-D (W.D. Okla. Dec. 20, 2013); *Reaching Souls Int'l, Inc. v. Sebelius,* No. 5:13-cv-1092-D (W.D. Ok. Dec. 20, 2013)(DeGiusti, J.); *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12-cv-2542 (BMC), 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) (holding that the accommodation violates RFRA and enjoining the mandate); *Persico v. Sebelius*, No. 13-cv-00303 (AJS) (W.D. Pa. Nov. 21, 2013); *Zubik v. Sebelius*, No. 13-cv-01459 (AJS) (W.D. Pa. Nov. 21, 2013).

For cases finding for the government on RFRA claims, *see, e.g.*, *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-cv-1303 (M.D. Tenn. Dec. 26, 2013); *University of Notre Dame v. Sebelius,* No. 13-cv-01276 (N.D. Ind. Dec. 20. 2013), emergency motion for injunction filed Dec. 23, 2013, No 13-3853 (7th Cir.); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-1261 (EGS), 2013 WL 6672400 (D.D.C. Dec. 19, 2013) (holding that the accommodation does not create a RFRA substantial burden), emergency motion for injunction filed Dec. 20, 2013, No. 13-

---

issues are legal and the facts are essentially undisputed, this and other district court opinions are at most data points, chiefly important as necessary steps to the appellate courts.

Based on the pleadings, the motion for the preliminary injunction and response, the parties' submissions, the lengthy oral argument, and the governing law, this court finds that the plaintiffs and the intervenor have demonstrated a substantial likelihood of success on the merits of their claim under the Religious Freedom Restoration Act. This court preliminarily enjoins the enforcement of the mandate to cover emergency contraception against the plaintiffs and intervenor. The reasons are explained below.

I.      **Background**

The plaintiffs, two universities affiliated with the Baptist Church, and the intervenor, a seminary affiliated with the Presbyterian Church, (together, the "plaintiffs"), believe as a matter of faith that life begins when an egg becomes fertilized. They also sincerely believe that the emergency contraceptives their group health-plan issuer or third-party administrator will have to pay for under the ACA's mandate cause abortions. In the plaintiffs' view, emergency-contraceptive products are "abortifacients." The plaintiffs contend that the ACA's accommodation is infirm under the Constitution and RFRA because the accommodation requires them to take an action that triggers and facilitates their employees' free access to abortion-causing drugs, making the plaintiffs complicit in the taking of innocent life and causing them to violate their belief that they must protect the innocent human life that is a fertilized egg. Because both failing to comply with the accommodation's requirements and refusing to provide emergency-contraceptive group health-plan coverage would expose the plaintiffs to onerous financial penalties, they argue that the ACA's

5368 (D.C. Cir.).

mandate and accommodation violate the Religious Freedom Restoration Act, the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause.

The plaintiffs seek a preliminary injunction barring enforcement of the mandate and partial summary judgment on their claims under the Religious Freedom Restoration Act, the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause.  The government has cross-moved for summary judgment.

### A.       The Plaintiffs

The varieties of religious beliefs affect how the issue is presented.  In some cases, the challenging organization is affiliated with a religion, such as the Catholic Church, that opposes all contraception, including pills designed to prevent an egg from becoming fertilized.  The plaintiffs in this case are affiliated with Protestant churches that believe that life begins at conception.  The plaintiffs are not opposed to all contraception methods, but they are opposed to some, including those that prevent a fertilized egg from implanting in the uterus.  Details about each of the parties are set out below.

### 1.       East Texas Baptist University

In October 1912, the State of Texas chartered the College of Marshall, a two-year college in Marshall, Texas.  (Docket Entry No. 70-1, Ex. A-1.)  The College of Marshall registered its first class in 1917.  (*Id.*)  In 1924, the Baptist General Convention of Texas assumed the college's debt. (*Id.*)  In 1944, the College of Marshall changed its name to East Texas Baptist College and "elevated" to a four-year institution.  (*Id.*)  The Southern Association of Colleges and Schools accredited East Texas Baptist College in 1957.  (*Id.*)  In 1984, the school became East Texas Baptist University ("ETBU").  In 2013, ETBU serves "over 1,250 students in 30 undergraduate degree

4

programs and 4 graduate degree programs." (Docket Entry No. 70-1, Oliver Decl., at ¶ 7.)

ETBU is a nonprofit corporation affiliated with the Baptist General Convention of Texas. (Docket Entry No. 70-1, Ex. A-1.)  A 36-member Board of Trustees governs ETBU.  (*Id.*)  The Baptist General Convention of Texas elects 19 board members; the ETBU Board elects the remaining 17.  (*Id.*)  ETBU holds its property in trust for, and conducts its affairs based on, the policies that the 36-member Board establishes.  (*Id.*)

ETBU is a coeducational institution chartered as a "religious, arts and sciences and pre-professional studies institution of higher education."  (*Id.*)  ETBU commits itself to "Christian stewardship" and focuses on the "development of intellectual inquiry, social consciousness, wellness, skills for a contemporary society, global awareness, and Christian character, [because] these endeavors prepare students to serve humanity and the Kingdom of God." (*Id.*) ETBU believes that the "Christian faith provides the surest foundation for life," and "employ[s a] Christian faculty who are dedicated to teaching, scholarship, advising, and service as they model the principles of the Christian faith.  As a Baptist university, [ETBU is] committed to the integration of learning and Christian faith in the pursuit of truth."  (*Id.*)

ETBU "seeks administrators, academic officers, faculty, and staff who have a personal relationship with Christ, who are familiar with truth as revealed in the Bible, who live out this truth in the presence of others, who can create an environment where Christ is lived out in the life of the individual, and who have the necessary knowledge, experience, and competence for the position." (*Id.*)  In "their initial and continuing employment, administrators, faculty, and staff at [ETBU] are to profess a saving relationship with Jesus Christ and to exhibit a lifestyle that demonstrates that commitment."  (*Id.*)  ETBU "has about 227 full-time employees and 56 part-time employees" who

profess these commitments.  (Docket Entry 70-1, Oliver Decl., at ¶ 28).

Included in these commitments is a belief that "Scripture calls Christians to uphold the God-given worth of human beings, as the unique image-bearers of God, from conception to death."  (*Id.* ¶ 16 (citing Genesis and Psalms)).  Consistent with this belief, ETBU "condemns the taking of innocent human life . . . and commands Christians to protect the weak and vulnerable."  (*Id.* ¶ 18 (citing Exodus and Psalms)).  ETBU follows the 2000 Baptist Faith and Message Study, including the commandment to "speak on behalf of the unborn and contend for the sanctity of all human life from conception to natural death."  (*Id.* (quoting Ex. A-4)).  ETBU "believes and teaches that abortion ends human life and is a sin."  ETBU contends that [it] is a violation of [its] teachings and religious beliefs to deliberately provide insurance coverage for, fund, sponsor, underwrite, or otherwise facilitate access to abortion-inducing drugs, abortion procedures, and related services." (*Id.* at ¶ 20).  ETBU objects to the use of emergency contraception drugs, like Plan B and Ella, and to devices like copper IUDs, believing that those drugs and devices cause death to a fertilized embryo.  (*Id.* at ¶¶ 23–26).

Consistent with those beliefs, the ETBU is self insured and uses a third-party administrator, Mutual Assurance Administrators, Inc. to provide its employees with a Healthcare Benefits Plan. Currently, the plan expressly excludes the emergency-contraceptive drugs and devices.  (*Id.* ¶ 27; Docket Entry No. 70-1, Ex. A-7 at 50).

### 2.    Houston Baptist University

Houston Baptist University ("HBU") is a Christian liberal-arts college in Houston, Texas. (Docket Entry No. 70-2, Sloan Decl., at ¶ 4).  HBU is affiliated with the Baptist General Convention of Texas and with the national Southern Baptist Convention.  (*Id.* at ¶ 5).  The student handbook

6

states that HBU's mission is "to provide a learning experience that instills in students a passion for academic, spiritual, and professional excellence as a result of [their] central confession, Jesus is Lord." (*Id.* at ¶ 6 (internal quotations omitted)).  HBU's bylaws require that "all those who become associated with [HBU] as a trustee, officer, member of the faculty or of the staff, and who perform work connected with the educational activities of the University, must believe in the divine inspiration of the Bible, both the Old Testament and New Testament, [and] that man was directly created by God. (*Id.* ¶ 8).  One of HBU's institutional goals is to "express Christ's Lordship as a function of its academic mission." (*Id.* at ¶ 10 (quotation marks omitted)).

Similar to ETBU, HBU believes that "Scripture calls Christians to uphold the God-given worth of human beings, as the unique image bearers of God, from conception to death." (*Id.* ¶ 11 (citing Genesis and Psalms)).  HBU, like ETBU, follows the 2000 Baptist Faith and Message, which instructs adherents that they "should speak on behalf of the unborn and contend for the sanctity of all human life from conception to natural death." (*Id.* ¶ 13).  HBU considers this commitment when it hires faculty, "all of whom are expected to affirm and teach that human life exists from conception to natural death, that the dignity fo life is a gift from God, and that as a result abortion, except where it is necessary to save the physical life of the mother, is a sin." (*Id.* ¶ 14).  HBU has "about 355 full-time and 118 part-time employees." (*Id.* ¶ 24).

HBU also considers this commitment in admitting students.  HBU admits students from all religions but expects that each student will abide by a Student Code of Conduct.  This Code affirms that HBU "embraces a biblical position which honors the sanctity of life and cannot support actions which encourage or result in the termination of human life through suicide, euthanasia, or abortion-on-demand." (*Id.* ¶ 15 (quotation marks omitted)).

HBU "has a sincere religious objection to providing coverage for emergency contraceptive drugs Plan B and Ella, since it believes [that] those drugs could prevent a human embryo–which it understands to include a fertilized egg before it implants in the uterus–from implanting in the wall of the uterus, causing the death of the embryo." (*Id.* ¶ 17). "The same objection applies to [certain] IUDs." (*Id.*)   HBU believes that "artificial means of [preventing] the implantation of a human embryo [are] abortion[s]." (*Id.* ¶ 18).   "It is similarly a violation of [HBU's]  religious beliefs to deliberately take any action (including providing access to health insurance) that would facilitate access to abortion causing drugs, abortion procedures, and related services, even if those items were paid for by an insurer or a third party administrator and not by [HBU]." (*Id.* ¶ 20).   Consistent with these views, [HBU's] employee health benefit plan does not cover abortions or emergency contraception such as Plan B, Ella, or other drugs and devices which it considers to be "abortion causing." (*Id.* at ¶ 22).

HBU is insured through a church health plan, Guidestone.  Guidestone has contracted with Highmark Blue Cross Blue Shield to be the third-party administrator (TPA) of the HBU plan.

### 3.      Westminster Theological Seminary

Founded in 1929, Westminster is a graduate-level theological seminary dedicated to the "[r]eformed understanding of the Christian faith" often associated with Presbyterianism. (Docket Entry No. 75-2 at ¶ 3).   Westminster "exists to serve Christ and his kingdom by extending the knowledge of the glory of God in Christ until that knowledge covers the earth as the waters cover the seas." (*Id.* ¶ 5).   Westminster requires its faculty to "subscribe *ex animo* to the Westminster Standards" and professes to hire "only personnel who belong to a Christian church and subscribe to a biblical orthodoxy (belief) and orthopraxy (practice)." (*Id.* ¶¶ 10–11).   These beliefs and

8

practices include protecting and defending the innocent, including unborn children. (*Id.* ¶ 14). Westminster has 60 full-time employees and 65 part-time employees who profess these commitments. (*Id.* ¶ 24).

Westminster believes that abortions sinfully end human life. (*Id.* ¶ 16). Westminster believes that emergency contraception such as Plan B, Ella, and certain IUDs are "abortion causing." (*Id.* ¶¶ 17–19). "Westminster has a sincere religious objection to providing [insurance] coverage for the emergency contraceptive drugs Plan B and Ella and their variants, since it believes those drugs could prevent a human embryo– which it understands to include a fertilized egg before it implants in the uterus–from implanting . . . , causing the embryo to die." (*Id.* ¶ 18). Westminster has the same objection to certain IUDs. As a result, "it is a violation of Westminster's teachings and religious beliefs for it to deliberately fund, sponsor, underwrite, or otherwise facilitate access to Plan B and Ella, or abortion-causing IUDs." (*Id.* ¶ 20). "It is similarly a violation of Westminster's religious beliefs to deliberately take any action (including providing access to health insurance) that would facilitate access to abortion-causing drugs, abortion procedures, and related services, even if those items were paid for by an insurer or a third party administrator and not by Westminster." (*Id.* ¶ 21).

Westminster is insured through Independent Blue Cross of Philadelphia. Curiously, though Westminster "would never condone insurance coverage for abortion-causing drugs, procedures or related services . . . its health insurer [had] inserted such coverage into Westminster's plan" without its knowledge. Westminster's insurer would not remove the coverage from its plan, and Westminster was trying "to find an insurer that will honor its requirements by providing health insurance without the offensive coverages, but has so far not found a viable alternative." (*Id.* ¶ 22).

9

As the litigation proceeded, Westminster separated its medical care coverage from its pharmaceutical coverage so as to remove coverage for what it considers to be abortifacient drugs from its employees' health insurance plans.  (Docket Entry No. 140).  Apparently, however, Westminster's plan still covers the IUDs that it finds objectionable.

###### B.       The ACA's Contraceptive Mandate and Accommodation

The ACA, enacted in 2010, with the Health Care and Education Reconciliation Act, established requirements for employer "group health plans," defined to include plans that are insured by issuers and plans self-insured by employers.  The ACA requires coverage for many preventative medical services with no charge for the patient.  The relevant requirement states that a "group health plan and a health insurance insurer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements" for "preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).

On July 19, 2010, HHS published a First Interim Final Rule stating that it was "developing these guidelines."  75 Fed. Reg. 41726, 41728 (July 2010).  On July 19, 2011, the Institute of Medicine ("IOM"), a congressionally funded entity established to recommend guidelines for the preventative services necessary for women, issued a report.  The IOM was given this task because there were no HRSA guidelines on preventative care for women when HHS issued the Interim Final Rules. The IOM report recommended including the "full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  The HRSA adopted this recommendation on August 1, 2011, as *Women's Preventative Services: Required Health Plan Coverage Guidelines* (the "Guidelines").

10

(Docket Entry No. 70-3, Ex. C-1).  The Guidelines required all nongrandfathered plans to "provide coverage without cost sharing in the first plan year . . . that begins on or after August 1, 2012" for all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  (*Id.*).

The FDA approves certain drugs that "prevent pregnancy after birth control failure or unprotected sex," including Levonorgestrel (Plan B) and ulipristal acetate (Ella).  (*Id.*).  The FDA also approves copper intrauterine devices that "may prevent [a fertilized] egg from attaching (implanting) in the womb (uterus)."  (*Id.*)  These drugs and devices are commonly known as emergency contraceptives.

Shortly after the HRSA published these Guidelines, the HHS amended the Interim Final Rule.  76 Fed. Reg. 46621-01 (Aug. 3, 2011).  The amended rule gave the "HRSA additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned [and to] establish the exemption."  *Id.* at 46623.  As amended, the regulation defined a "religious employer" as an organization that meets "all of the following" criteria:

> (1)   The inculcation of religious values is the purpose of the organization.
> (2)   The organization primarily employs persons who share the religious tenets of the organization
> (3)   The organization serves primarily persons who share the religious tenets of the organization.
> (4)   The organization is a nonprofit organization as described in section 6033(a)(1) and 6033(a)(3)(a)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

76 Fed. Reg. at 46626.  The fourth criteria "refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order."  76 Fed. Reg. at 46623.

11

The mandate and religious-employer exemption caused "over 200,000 responses to the request for comments on the amended interim final regulations." 77 Fed. Reg. 8725, 8726-27 (Feb. 15, 2012).  "[A] number of comments asserted that the religious employer exemption [wa]s too narrow."  77 Fed. Reg. at 8727.  These comments came from religiously affiliated educational institutions, health-care organizations, and charities.  *Id.*  Some "expressed concern that the exemption for religious employers will not allow them to continue their current exclusion of contraceptive services."  Others "expressed concerns about paying for such services and stated that doing so would be contrary to their religious beliefs."  *Id.*

In response, the HHS announced a "Temporary Enforcement Safe Harbor" period.  77 Fed. Reg. 8726.  This postponed enforcement of the mandate against nonprofit organizations with religious objections, to allow the development of proposed changes accommodating the objections of nonexempt religious nonprofits.  (Docket Entry No. 71-3, Ex. C-4, Department of Health and Human Services, *Guidance on the Temporary Enforcement Safe Harbor for Certain Employees* (updated June 28, 2013)).  On March 21, 2012, the HHS published an Advanced Notice of Proposed Rulemaking announcing the intent to supplement the religious-employer exception with an accommodation for certain nonexempt religious organizations.  77 Fed. Reg. 16501, 16503 (March 21, 2012) ("[T]he Departments announced plans to expeditiously develop and propose changes to the final regulations . . . [including] accommodating non-exempt, non-profit religious organizations' religious objections to covering contraceptive services . . . .").

On February 6, 2013, the HHS published a Notice of Proposed Rulemaking with two "key changes" to the preventative services coverage rules:

> First, the proposed rules would amend the criteria for the religious employer exemption to ensure that an otherwise exempt employer

12

> plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths. Second, the proposed rules would establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage.

78 Fed. Reg. 8456, 8460-61 (Feb. 2013).

The HHS proposed "eliminating the first three prongs of the [religious-employer] definition and clarifying the application of the fourth." *Id.* When the HHS "first defined religious employer, the primary goal was to exempt the group health plans of houses of worship. . . . By restricting the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and religious orders, the fourth prong of the current definition of religious employer would alone suffice to meet the goal." *Id.* The HHS also proposed an accommodation for "eligible organizations with religious objections to contraceptive coverage." *Id.* at 8462. The proposed accommodation would provide "plan participants and beneficiaries contraceptive coverage without cost sharing while insulating their employers or institutions of higher education from contracting, arranging, paying or referring for such coverage." *Id.* Over 400,000 comments were submitted.

The HHS issued the final mandate with the revised exemption and accommodation in June 2013. *See* 78 Fed. Reg. 39870 (July 2, 2013). The revision adopted the simplified definition of religious employer exempt from the mandate. The accompanying explanation stated that "the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement," and noted that

13

religious employers meeting this definition were "more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. at 39874. The final regulation defined an exempt religious employer an "organization that is organized and operates as a nonprofit entity and is referred to in [Internal Revenue Code] section 6033(a)(3)(A)(I) or (iii)." 45 C.F.R. § 147.131(a). "[C]hurches, their integrated auxiliaries, and conventions or associations of churches" qualify for the exemption, as well as the "exclusively religious activities of any religious order." 26 § 6033(a)(3)(A)(i), (iii).

The final regulation included an accommodation for eligible organizations such as the plaintiffs. These organizations are not "religious employers" exempt from the requirement to include contraceptive coverage with no cost-sharing in their employee group health plans. "After meeting a self-certification standard, . . . , nonprofit religious organizations that qualify for these accommodations are not required to contract, arrange, pay, or refer for contraceptive coverage; however, plan participants and beneficiaries . . . will still benefit from separate payments for contraceptive services without cost sharing or other charge . . . ." Id. The final regulation defined an "eligible organization" that is not exempt but is subject to the accommodation as an organization that satisfies all of the following criteria:

(1)     The organization opposes providing coverage for some or all of the contraceptive services required to be covered . . . on account of religious objections.

(2)     The organization is organized and operates as a nonprofit entity.

(3)     The organization holds itself out as a religious organization.

45 C.F.R. § 147.131(b)(1)–(3).

If such an organization complies with the self-certification requirement, and meets additional requirements, it complies with the mandate and avoids the statutory penalties if it:

> (4)      . . . self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.   The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b)(4).

Under the rule, an eligible organization must prepare the self-certification and furnish a copy to its issuer or, if the organization self-insures, to its TPA on request once in the plan-coverage period.  Those acts accomplished, the organization is deemed to have complied with the preventive-services mandate.   The rule states:

> (c) (1)  General rule.  A group health plan established or maintained by an eligible organization that provides benefits through one or more group health insurance issuers complies for one or more plan years with any [preventative services requirement] to provide contraceptive coverage if the eligible organization or group health plan furnishes a copy of the self-certification described in (b)(4) of this section to each issuer that would otherwise provide such coverage in connection with the group health plan.  An issuer may not require any documentation other than the copy of the self certification from the eligible organization regarding its status as such.

45 C.F.R. § 147.131(c)(1).  "The final regulations do not require the self-certification to be submitted to any of the Departments."  78 Fed. Reg. 39878.

When the eligible organization is self-insured, the self-certification is provided to the TPA.

15

If an issuer provides the coverage and payments, the self-certification goes to that issuer.  The self-certification does more than state that the organization qualifies for the accommodation because it objects on religious grounds to contraceptive coverage.  The form notifies the TPA or issuer of their obligations set out in the federal regulations.

Once a group health plan issuer is notified of and receives a copy of the organization's self-certification, the issuer must:

> (A)   Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and
>
> (B)   Provide separate payments for any contraceptive services required to be covered under the [preventative services requirement] for plan participants and beneficiaries for so long as they remain enrolled in the plan.

45 C.F.R. § 147.131(c)(2)(i)(A)-(B).  The issuer is required to pay for contraceptive services requested by plan participants and beneficiaries.  The issuer must segregate premium revenue collected from the eligible organization from the monies used to make payments for contraceptive services.  When it makes payments for contraceptive services used by plan participants and beneficiaries, the issuer must do so without imposing any premium, fee, or other charge, for any part, directly or indirectly, on the eligible organization, its group health plan, or its plan participants or beneficiaries. In making such payments, the issuer must ensure that it does not use any premiums collected from eligible organizations.  A statement accompanying the accommodation explained that "cost neutrality" would remove the need for a source of money to pay for the emergency contraceptive products or services:  "issuers have various options for achieving cost neutrality, notwithstanding that they must make payments for contraceptive services without cost sharing, premium, fee, or other charge to the eligible organization, the group health plan, or plan

16

participants." Fed. Reg. at 39877.

If the eligible organization's group plan is self-insured, the TPA must provide or arrange for payments for contraceptive services requested by plan participants or beneficiaries. *See* 26 C.F.R. 54.9815-2713A; 29 C.F.R. §§ 2510.3-16, 2590.715-2713A. This requirement is imposed through the Department of Labor's ERISA enforcement authority. 78 Fed. Reg. at 39,874. The self-certification is "treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." *Id*. at 39,879. The TPA must provide these services "without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan." *Id*. at 39,879-80. The TPA may seek reimbursement for such payments through adjustments to its federally-facilitated Exchange ("FFE") user fees. *Id*. at 39,882.

The self-certification form provided to the TPA or issuer sets out the regulations requiring notice to plan participants and beneficiaries that they may get contraceptive coverage without cost. The regulations recognize that application materials are distributed to plan participants and beneficiaries for enrollment (or reenrollment) in group health coverage for each plan year. The regulations require the TPA or issuer to send notice separate from, but to the extent possible contemporaneous with, the application materials, advising plan participants and beneficiaries that the TPA or issuer provides separate payments for contraceptive services at no cost as long as the participant or beneficiary remains enrolled in the plan. 29 U.S.C. § 2590.715-2713A (d); 45 U.S.C. § 147.131.

The accommodation is intended to insulate eligible nonprofit religiously affiliated organizations and their group health plans from having to "contract, arrange, pay or refer for

contraceptive coverage."  78 Fed. Reg. at 39876.  "[B]ecause the payments for contraceptive services are not a group health plan benefit . . . th[e] policy ensures that eligible organizations and their plans do not contract, arrange, pay, or refer for contraceptive coverage, and that such coverage is expressly excluded from their group health insurance policies."  *Id.*

Neither the issuer nor the TPA that has contracted with the employer to provide the group health plan may refuse to pay for the contraceptive benefits.  On receiving the copy of the self-certification, the TPA may, however, decide not to enter into, or remain in, a contractual relationship with the eligible organization to provide administrative services for the plan.  29 U.S.C. § 2590.715-2713A (b)(2) ("If a third party administrator receives a copy of the self-certification . . . and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan to provide administrative services for the plan, the third party administrator shall provide or arrange payments for contraceptive services[.]")  But to comply with the ACA and the companion provisions in ERISA and the Code, the eligible religious organization is prohibited from: (1) directly or indirectly interfering with a TPA's efforts to provide or arrange separate payments for contraceptive services for participants or beneficiaries in the plan; and (2) directly or indirectly seeking to influence a TPA's decision to provide or arrange such payments.  29 U.S.C. § 2590.715-2713A(b)(1)(iii).

A religious organization eligible for the accommodation has choices to make by January 1, 2014.  It may violate the mandate and incur penalties of $100 per day for each affected individual, 26 U.S.C. § 4980D(b)(1); it may violate the law by discontinuing all health-plan coverage for

employees at a cost of $2,000 per employee, *id.* § 4980H(c)(1);[3] or it may self-certify that the organization qualifies for the accommodation.  A TPA for a church plan not subject to ERISA that receives a self-certification from the eligible religious organization also has choices.  It may discontinue participation in the church plan; it may refuse to change its coverage and expose the employer to ACA penalties; or it may help the employer with the accommodation by paying for requested contraceptive services.

In *Priests for Life*, the government argued that the $100 dollar tax penalty would not apply to the plaintiffs who refused the accommodation because their insurers would have to provide insurance coverage as required by law, including contraceptive coverage.  *Priests for Life*, 2013 WL 6672400,*3 n.2 (citing 42 U.S.C. §§ 300gg-13; 300gg-22; 76 Fed. Reg. 46,621,623 (Aug. 3, 2011)). But, as the court recognized in that case, the plaintiffs would still suffer the harm they alleged because they would be left paying for the objectionable coverage.  Additionally, though not slated for effect until 2015, the $2,000-per-employee fine would apply to employers who fail to *offer the opportunity to enroll* in the minimum coverage.  26 U.S.C. § 4980H(a).  So if the plaintiffs refused the accommodation in addition to not providing the coverage, it appears that the insurer would have to force-place the insurance, which would expose the plaintiffs to severe administrative penalties.

### E.    The Parties' Arguments on the Impact of the Accommodation

The plaintiffs allege that the accommodation violates the Religious Freedom Restoration Act because it places a substantial burden on the freedom to follow the commands of their religion. The plaintiffs argue that self-certification facilitates access to free emergency contraceptives, in direct

---

[3]The government has postponed the application of this penalty until 2015.  *See* Docket Entry No. 70-2 ¶ 68.

19

violation of the religious commandment that they protect innocent life from the moment of conception until death.  The accommodation requires each plaintiff to provide a copy of the "self certification to the plan's health insurer (for insured health plans) or a third party administrator (for self-insured plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement."  (Docket Entry No. 107-1, Ex. E-1).  "This certification is an instrument under which the plan is operated."  (*Id.*).  The plaintiffs object to "designating" their TPA or insurer as administrators for their employees to receive emergency contraceptive benefits without cost.  The self-certification notifies the TPA or issuer of their obligations to provide contraceptive-coverage benefits to employees otherwise covered by the plan and to notify the employees of their ability to obtain these benefits.  The plaintiffs argue that by requiring them to comply with the self-certification requirements, the government's accommodation makes them facilitate and trigger free access to emergency contraceptives for their employees.  The plaintiffs argue that the accommodation forces them to take actions that make them complicit in what they believe to be immoral conduct, coerced by the threat of ruinous fines if they do not fill out the self-certification and provide it to their issuer or TPA.

The government does not contend that the plaintiffs' religious beliefs about abortion, abortifacients, or forced complicity through facilitation are insincerely held, unreasonable, or "fringe."  Instead, the government argues that the accommodation does not require the plaintiffs to do much and does not require more than they were already doing in different contexts, and is therefore not burdensome at all.  In the alternative, the government argues that should the court find a burden on the plaintiffs' religious exercise, the court should find the burden *de minimis* because the "real" actions that the plaintiffs find objectionable are independent actions taken by third parties.

20

The government contends that the "forced" act of self-certification is too attenuated and removed from whether any employee receives free emergency contraceptives though the plaintiffs' TPA or issuer to impose a substantial burden that could violate RFRA.

## II.    The Legal Standards

To obtain a preliminary injunction, the plaintiffs must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

Summary judgment is appropriate if "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  "The movant bears the burden of identifying those portions of the record it believes demonstrates the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." See *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material

fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir.2005) (citation omitted).

In deciding a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir.2008). When the moving party has met its Rule 56 burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.2007). "This burden is not satisfied with some metaphysical doubt as to the material facts, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Factual controversies resolve in the nonmoving party's favor, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.*

## III.    Article III Standing

The government challenged HBU's standing in its reply in support of its motion to dismiss plaintiffs' claims. (Docket Entry No. 103). The government argues that it cannot enforce the mandate through HBU's TPA because HBU is self-insured through a church plan. (*Id.* at 5 (citing 29 U.S.C. §§ 1002(16), 1003(b)(2); 29 C.F.R. § 2510.3-16(b); 78 Fed. Reg. 39,870, 39,879–80 (July 2, 2013))). According to the government, "HBU remains eligible for the accommodation under the final regulation promulgated by [the government] and therefore need not contract, arrange, pay, or refer for contraceptive coverage. But its TPA need not provide separate payments[.]" At bottom, the government argues that even though HBU will have to self-certify, that self-certification will not result in any enforceable objectionable action by the TPA.

This standing argument is unpersuasive for the reasons set out in *Roman Catholic*

22

*Archdiocese,* 2013 WL 6579764, at *6–*7; *but see Roman Catholic Archbishop of Washington v. Sebelius*, No 13-1441 (ABJ), at 46–51 (D.D.C. Dec. 20, 2013) (concluding that the plaintiff in a similar situation lacked standing because the government lacked the regulatory authority to penalize the plaintiff's TPA for not complying with the ACA's requirements).  HBU's alleged injury-in-fact does not wholly depend on what its TPA may or may not be penalized for doing or not doing. Instead, HBU's injury arises from the fact that the accommodation requires it to comply with the self-certification steps or face severe penalties.  As HBU argued in its reply to the standing argument, HBU is harmed when it has to fill out the form authorizing its TPA to provide coverage and payments for emergency contraceptives, designating its TPA as the administrator for no-cost-sharing contraceptive benefits, and informing the TPA of its statutory and regulatory obligations. The self-certification steps do not depend on whether the government currently has the ability to use the  enforcement mechanism it has specified to punish the TPA if it does not comply with its statutory and regulatory obligations.  That the government apparently missed a regulatory loophole and cannot currently penalize a TPA for a failure to follow the ACA's mandate does not eliminate what HBU must do or risk penalties, or eliminate what the ACA requires of both HBU and its TPA.

Similarly, HBU's standing does not turn on whether one of its employees actually seeks payment for emergency contraception, or whether HBU's TPA for a given year decides to end its contractual relationship with HBU.  The government's present lack of ability to use the enforcement mechanism it specified if HBU's TPA refuses to provide what the ACA mandates and nonetheless

23

maintains its relationship with HBU does not deprive HBU of standing in this case.[4]

## IV.    The Religious Freedom Restoration Act Claims

In 1990, the Supreme Court held that the "Free Exercise Clause of the First Amendment d[id] not prohibit governments from burdening religious practices through generally applicable laws." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (describing *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)). In *Smith*, the Supreme Court also held that "the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws." *Id.* (citation omitted).

Congress rejected the Supreme Court's *Smith* holdings when it passed the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, *et seq*. Noting that *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C § 2000bb(a)(4), RFRA expressly "restore[d] the compelling[-]interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963)[,] and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and [guaranteed] its application in all cases where free exercise of religion is substantially burdened" in order to "provide a claim . . . to persons whose religious exercise is substantially burdened by government," § 2000bb(b)(1)-(2). In other words, " the

---

[4.]    At the oral argument on the motion, HBU asked the rhetorical question: "I think the big question here is why is it so important for HBU to sign this form now, because under the defendants' approach, it's completely meaningless. They can't use it for anything. . . . What is the purpose of making HBU sign a form that doesn't mean anything and it doesn't mean anything so much that there's not even a wisp of Article III injury." (Tr. 46). The government responded that "the point of completing the self-certification form[] is that the regs provide that on all the accommodation he needs to do is self-certify, complete the requirement. And so although HBU's TPA isn't going to be required to make the payments, HBU itself is still subject to the contraceptive coverage requirement. [I]t [remains] eligible for the accommodation and that if it fills the self-certification form it then complies with the requirement also and so it also would not be subject to any of the enforcement scheme." (Tr. 102). The forced-choice of filling out the self-certification form or providing the coverage still exists. The form requires HBU to tell the TPA about its obligation to pay. That the government apparently missed a regulatory loophole for forcing the TPA to act does not affect HBU's standing.

24

Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability'" unless the government can satisfy the compelling-interest test. *O Centro*, 546 U.S. at 424. (quoting § 2000bb-1(a)).

The plaintiffs have established a sincere religious belief that they cannot support, endorse, or facilitate the use of emergency contraceptives. The plaintiffs have a sincerely held religious belief that any complicity in the procurement of what they consider to abortifacient drugs is a sin. The record contains ample evidence that plaintiffs have long professed that belief, fashioned the governance of their institutions around that belief, and that the belief is an important tenet of their faith and the mission of their institutions. The threshold inquiry under RFRA is whether the ACA's accommodation substantially burdens the exercise of that belief. *See Diaz v. Collins*, 114 F.3d 69, 71 (5th Cir. 1997). If the court finds a substantial burden, the government must then show that the burden "is in furtherance of a compelling governmental interest" and that it "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b).

The issue currently dividing district courts is whether the court's inquiry is limited to the magnitude of the pressure the government exerts in compelling the plaintiffs to self-certify their objection and thereby facilitate the provision of no-cost-sharing emergency contraceptive services to their employees, as the plaintiffs contend, or whether the court may (or must) also examine from an objective perspective the nature or quality of the acts or behavior the government compels or pressures the plaintiffs to perform, as the government contends. *Compare Roman Catholic Archdiocese,* 2013 WL 6579764, at *14 (E.D.N.Y. Dec. 16, 2013) ("The Court cannot say that "the line [plaintiffs] drew was an unreasonable one. *Thomas*, 450 U.S. at 715.")*, with Priests for Life*, 2013 WL 6672400, at *10 (D.D.C. Dec. 19, 2013) (finding that "Plaintiffs have not stated a prima

25

facie case under RFRA" because objectively viewed, completing the self-certification form was not a substantial burden.").

### A.  Substantial Burden

RFRA does not define "substantial burden," but the statute refers to and adopts cases that control the analysis.  *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069 (9th Cir. 2008) (en banc) ("[T]he cases that RFRA expressly adopted and restored–*Sherbert, Yoder,* and federal court rulings prior to *Smith*–also control the 'substantial burden' inquiry."), *cert. denied,* 129 S. Ct. 2763 (2009); *see also Merced v. Kasson*, 577 F.3d 578, 587–88 (5th Cir. 2009) (beginning the "substantial burden" inquiry under TRFRA, the Texas RFRA analog, with a detailed analysis of *Sherbert* and *Yoder*).  In *Sherbert*, "a member of the Seventh-day Adventist Church was discharged by her South Carolina employer because she would not work on Saturday, the Sabbath Day of her faith."  *Sherbert*, 374 U.S. at 399.  She subsequently failed to find alternative employment because she refused to work on Saturday, which prompted her to apply for unemployment benefits under South Carolina law.  South Carolina law required applicants to show good cause for failing to accept available suitable work.  All levels of administrative and state judicial review concluded that her religious objections to Saturday work did not amount to good cause.  The Supreme Court reversed, holding that:

> [N]ot only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable.  The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.  Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* at 404.

In *Yoder*, members of the Old Order Amish religion and the Conservative Amish Mennonite Church did not enroll their 14- and 15-year-old children in public or private school, as Wisconsin's compulsory school-attendance law required.  *Yoder*, 406 U.S. 208–09.  They believed "that their children's attendance at high school, public or private, was contrary to the Amish religion and way of life [and that] sending their children to high school . . . would not only expose themselves to the danger of the censure of the church community [but also] endanger their own salvation and that of their children."  *Id.* at 209.  They were subsequently convicted of violating the compulsory-attendance law and fined \$5.  *Id.* at 208.  The Wisconsin Supreme Court reversed and held that "the State had failed to make an adequate showing that its interest in 'establishing and maintaining an educational system overrides the defendants' right to the free exercise of their religion.'"  *Id.* at 213 (quoting 49 Wis.2d 430, 477; 182 N.W.2d 539, 547 (1971)).  The Supreme Court held that the

> impact of the compulsory-attendance law on respondents' practice of the Amish religion [wa]s not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to *perform acts* undeniably at odds with fundamental tenets of their religious beliefs. . . .  [The compulsory-attendance law] carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. . . .  [It] carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.

*Id.* at 218 (emphasis added) (internal citation omitted).  *Yoder* speaks in terms of "fundamental tenets."  RFRA defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *See* 42 U.S.C. § 2000bb-2(4) (citing § 2000cc-5).  That "definition is undeniably very broad, so the term 'exercise of religion' should be

27

understood in a generous sense."  *Korte v. Sebelius*, 735 F.3d 654, 674 (7th Cir. 2013).

"Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by threat of civil or criminal sanctions (*Yoder*). *Navajo Nation*, 535 F.3d at 1069–70.  In the RLUIPA context, the Fifth Circuit has explained that the government "substantially burdens a religious belief" when it "'truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.'" *Moussazadeh*, 703 F.3d 781, 793 (quoting *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).[5]

The courts recognize that a religious exercise may be substantially burdened by government action that compels a plaintiff to do something inconsistent with religious beliefs; forbids the plaintiff from doing something his religion requires; or indirectly pressures the plaintiff to act or refrain from acting in a way his religion requires.  *See Korte*, 735 F.3d at 706 (Rovner, J., *dissenting*) (citations omitted) (describing three categories of substantial burden and aggregating cases).  When the government forces people to do something their faith forbids to avoid punishment, including harsh fines, the government imposes a substantial burden.  "While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."  *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981).

The issue in this and similar cases is not whether the government is directly compelling or putting substantial pressure on the religious organizations to do something that they find inconsistent

---

[5.] The government's focus on the twice-repeated word "significant" is misplaced because the Fifth Circuit defines a government action as significant when it "(1) influences the adherent to act i a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and on the other hand, following his religious beliefs."  *Id.* (citing *Adkins*, 393 F.3d at 570).

with their religious beliefs.  All agree that the penalties for failing to self-certify and refusing to provide no-cost-sharing contraceptive services to employees as part of the group health plan benefits are onerous.  Nor do these cases raise the issue of whether the plaintiffs' religious beliefs are sincerely held.  The cases are clear that once a court determines that the religious tenet or practice is based on sincerely held religious belief, the court is not free to assess whether it is a central, critical, or important part of that religion.  *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717 (1981).  The beliefs need not be longstanding, central to the claimant's religious beliefs, internally consistent, consistent with any written scripture, or reasonable from another's perspective. They need only be sincerely held.  The plaintiffs clearly meet this requirement.

The government argues that not all government-compelled or government-forbidden action substantially burdens a religious belief:  "De minimis burdens on the free exercise of religion are not of constitutional dimension."  *Rapier v. Harris*, 172 F.3d 999, n.2 (6th Cir. 1999) (citing *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 158 (5th Cir. 1980), *cert. denied*, 449 U.S. 1124 (1981); *Windsor Park Baptist Church, Inc. v. Ark. Activities Ass'n*, 658 F.2d 618 (8th Cir. 1981)).[6] The government emphasizes *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008), to develop the argument.  In that case, Russell Kaemmerling, a federal prisoner, sought to enjoin the application of the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. §§ 14135–14135(e).  That act directed the Bureau of Prisons to collect body-tissue samples to have a bank of DNA identifiers for prisoners convicted of certain felonies.  Kaemmerling was an evangelical Christian who held the

---

[6].  *Rapier* and a long line of RLUIPA and free exercise cases have found *de minimis* burdens in circumstances subjecting prisoners to temporary or transient conditions.  For example, in *Rapier*, "the unavailability of a non-pork tray for Mr. Rapier at 3 meals out of 810 d[id] not constitute more than a de minimis burden on Mr. Rapier's free exercise of religion. Mr. Rapier ha[d] not alleged a routine or blanket practice of denying him pork-free meals."  This line of cases is inapposite.

sincere religious belief that collecting and retaining DNA was "tantamount to laying the foundation for the rise of the anti-Christ" *Id.* 673. He argued that DNA sampling, collection, and storage without any limit on use violated "God's temple, as represented by one's mortal body, willed with the Holy Spirit." *Id.* at 678. "Kaemmerling [made] abundantly clear that he does not challenge the collection of any particular DNA carrier–such as blood, saliva, skin, or hair–but rather that, regardless of the medium by which the government acquires access to his DNA, he objects to the government collecting his DNA information from any fluid or tissue sample they may recover." *Id.* The objection was not an objection to the Bureau of Prisons collecting tissue or body samples, but an objection to the government's later action of extracting DNA information from those samples. *See id.*

The D.C. Circuit concluded that Kaemmerling did "not allege facts sufficient to state a substantial burden on his religious exercise because he cannot identify any 'exercise' which is the subject of the burden to which he objects." *Id.* at 679. The actions that offended Kaemmerling's sincerely held religious beliefs were not his actions, but the independent actions of third parties. There was only one action required of him, and he did not object to it. The court concluded that the link between Kaemmerling's own act of allowing a sample of his fluid or tissue to be taken— to which he did not object — and the independent acts of others extracting DNA from those cells— to which he did object — was too attenuated and removed. The court explained:

> The extraction and storage of DNA information are entirely activities of the FBI, in which Kaemmerling plays no role and which occur after the [Bureau of Prisons] has taken his fluid or tissue sample (to which he does not object). The government's extraction, analysis, and storage of Kaemmerling's DNA information *does not call for Kaemmerling to modify his religious behavior in any way–it involves no action or forbearance on his part, nor [did] it otherwise interfere with any religious act in which he engages*. Although the

> government's activities with him fluid or tissue sample after the
> [Bureau of Prisons] takes it may offend Kaemmerling's religious
> beliefs, they [could not] be said to hamper his religious exercise
> because they do not "pressure [him] to modify his behavior and to
> violate his beliefs."

*Id.* at 679 (emphasis added) (quoting *Thomas*, 450 U.S. at 718).  Because Kaemmerling did not have

to "modify his religious behavior," there was no burden, much less a substantial burden, on the

exercise of his religion.  *Id.* (citing *Bowen v. Roy*, 476 U.S. 693, 696-703 (1986) (holding that the

interference caused by the government's referring to a person using a social security number, which

the person or her parents believe will "'rob the spirit' of [the person] and prevent her from attaining

greater spiritual power," is not a substantial burden because it does not "affirmatively compel

appellees, by threat of sanctions, to refrain from religiously motivated conduct or to engage in

conduct that they find objectionable for religious reasons.")).

     When a plaintiff is compelled or pressured to engage in action that he does not object to on

religious grounds, that compulsion or pressure does not require a modification of religious behavior

and there is no actionable burden.  That is true even if the plaintiff's action leads to acts by third

parties, independent from what the plaintiff did, that the plaintiff does find religiously offensive.

     *Kaemmerling* stated that "[a]n inconsequential or *de minimis* burden on religious practice

does not rise to th[e substantial burden] level, nor does a burden on activity unimportant to the

adherent's religious scheme."  *Id.* at 678 (citing *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir.

2002)).   But because the D.C. Circuit concluded that there was no modification of any religious

behavior on Kaemmerling's part, the "*de minimis* burden on religious practice" language appears

to be dicta.  And the case the D.C. Circuit cited for that proposition, *Levitan*, was not a RFRA case

and was decided using approaches that do not apply under RFRA.

In *Levitan*, the appellants were federal prisoners and Catholics.  A prison rule prevented them from consuming small amounts of wine during Communion at mass.  The plaintiffs sued under the Free Exercise Clause of the First Amendment.  The D.C. Circuit in *Levitan* noted that the plaintiffs did not bring a RFRA challenge.  The statutory framework of RFRA is different than the constitutional framework of the First Amendment as applied to prisoners in 2002.  In *Levitan*, the court, without citation, stated that the "challenged rule must also burden a central tenet or important practice of the litigant's religion."  The court, despite the Supreme Court's warning to the contrary in *Smith*, explained:

> Nonetheless, it is sometimes the case that litigants can make no credible showing that the affected practice *is either central or important to their religious scheme.  In such cases*, the *de minimis* burden imposed by the challenged law is not constitutionally cognizable.   In other cases, in which the practice at issue is indisputably an important component of the litigants' religious scheme, such evidence may be relevant to overcome any claim that the impact of the challenged law is *de minimis*.   Moreover, a rule that bans a practice that is not central to adherent's religious practice might nonetheless impose a substantial burden if the practice is important and based on a sincere religious belief.

*Levitan*, 281 F.3d at 1321 (emphasis added) (internal quotation marks and citations omitted).  RFRA seems to foreclose the analysis that the D.C. Circuit used to conclude that some violations are *de minimis*.  Whether the affected practice is central or important to a religion is not for the court to determine.  "Recall that [under RFRA's statutory framework] 'exercise of religion' means '*any* exercise of religion, *whether or not compelled by, or central to*, a system of religious belief.'"  *Korte* 735 F.3d at 682 (citing 42 U.S.C. § 2000cc-5(7)(A)).  The definition of *de minimis* burden as originally used in the D.C. Circuit meant a burden that affected an unimportant or tangential religious practice.  *Levitin* suggests that evidence of the importance of a practice to a religious

scheme overcomes a claim that a law requires a *de minimis* burden.  Finally, the D.C. Circuit recognized that a rule that bans an important, sincere belief would be substantial.

The government's reliance on *Kaemmerling* appears misplaced.  First, it is unclear how the *de minimis* analysis applies in the RFRA context.  Second, the plaintiffs have articulated an important and sincere religious belief that "overcome[s] any claim that the impact of the challenged law is *de minimis*."  *Levitan*, 271 F,.3d at 1321.  Finally, and perhaps most importantly, the burden in *Kaemmerling* was insubstantial under RFRA because he did not object to what the government forced *him* to do.[7]  In the present case, of course, the plaintiffs vigorously object on religious grounds to the act that the government requires them to perform, not merely to later acts by third parties.  And as discussed in more detail below, in the present case, the acts that follow from what the plaintiffs are required to do are not as independent or removed as they were in *Kaemmerling*.

Fifth Circuit case law also supports the conclusion that the RFRA substantial-burden inquiry does not allow the court to discard the plaintiff's view that a government-compelled or government-coerced modification is substantial.  The Fifth Circuit considers whether a *burden* is insubstantial, that is, the compelling or coercive mechanism itself; not whether the modification is substantial.

In *Walsh*, the plaintiffs challenged the Louisiana High School Athletic Association rule that "upon the completion of elementary or junior high school, a student is eligible to participate immediately in interscholastic athletic competition only at a high school within his home district." *Walsh*, 616 F.2d at 155.  There was also a transfer rule, "a student is ineligible to participate in interscholastic athletic competition for a period of one year if he matriculates at a high school

---

[7]   The D.C. Circuit's decision upholding a for-profit corporation's challenge to the ACA's contraceptive mandate, *Gilardi v. U.S. Dep't of Health and Human Servs.*, 733 F.3d 1208, 1217, cited *Kaemmerling* only three times, once rejecting the government's argument that the burden identified was too remote and too attenuated to be substantial.

outside of his home district after completing elementary or junior high school." *Id.* These rules were aimed at curbing recruitment of young athletes. The plaintiffs could not participate in interscholastic athletic competitions because they attended the only Lutheran high school in greater New Orleans operated by the Missouri Synod, and the school was outside their home district. The plaintiffs brought a free exercise challenge under the First Amendment. The Fifth Circuit rejected the argument:

> The rule merely prevents a child from participating in interscholastic athletic competition during his ninth grade year. Even so, the ambit of the rule is limited. It does not forbid a student from participating in all athletic activities. The transfer rule does not prevent ninth graders at Lutheran High School from participating in intramural athletic competition. Neither does the rule prohibit such students from trying out for or from practicing with the Lutheran High School varsity athletic teams. It simply prevents a child from representing Lutheran High School in an interscholastic athletic contest for a period of one year. The burden on the free exercise of religion is *de minimis*.

*Id.* at 158. The analysis focused on the nature and extent of the coercive pressure, finding that it was not substantial, and did not examine the decision to attend a religious school. *See also Tagore v. U.S.*, 735 F.3d 324, 330 (5th Cir. 2013) ("Assuming, again, that Tagore succeeds in establishing a sincerely held religious belief that mandates her wearing a 3-inch kirpan blade, the remaining predicate to a prima facie RFRA case is whether the [restriction on blades over 2.5 inches] substantially burdened her religious practice. This is not a serious hurdle: she gave up her job rather than wear a shorter-bladed kirpan." (citations omitted)).; *accord Johnson v. Robison*, 415 U.S. 361 (1974) ("The challenged legislation in the present case does not require appellee and his class to make any choice comparable to that required of the petitioners in *Gillette*. The withholding of educational benefits involves only an incidental burden upon appellee's free exercise of religion–if,

34

indeed, any burden exists at all."); *Braunfeld v. Brown*, 366 U.S. 599, 606 (1961) (using "[s]tatutes which [both] tax income and limit the amount which may be deducted for religious contributions impose an indirect economic burden on the observance of the religion of the citizen whose religion requires him to donate a greater amount to his church"as example of insubstantial burden.); *Navajo Nation*, 535 F.3d at 1070 (holding that the burden was insubstantial when there was no government-coerced action or government-forced choice between the plaintiffs practicing their religion or receiving a government benefit).

The case law supports the conclusion that the requirement of a "substantial" burden focuses on the nature and effect of the government restraint.  The religious organization plaintiffs have shown a sincerely held religious belief that the court cannot second-guess.  The plaintiffs have also shown that if they do not comply with a certain requirement that they believe offends that belief, they will face onerous fines.  The government does not dispute that the fines are onerous.  But the government does dispute that the requirement can reasonably be said to require a religiously offensive or burdensome act.

This court agrees that the inquiry does not end with a finding that the plaintiffs may face onerous fines.  But the unsettled issue does not appear to be whether the court must accept the plaintiffs' subjective view of whether they are compelled or pressured to act in a religiously offensive way, or whether the court must examine the nature and quality of the act to gauge whether it is offensive from some kind of objective perspective.  The case law provides an answer to this question:  the plaintiffs' view of whether the act is religiously offensive controls.  The dispute appears instead to focus on two related, but distinct, antecedent questions.  The first question is whether what the plaintiff religious organizations object to is an act that *they* are compelled or

pressured to do and that they were not already doing.  The second question is whether what the religious organizations are required to do is sufficiently linked to what they *themselves* have identified as offensive to their religious faith to be burdensome.  If what the organizations identify as the religiously offensive acts are independent acts of third parties too far removed from the organizations' own conduct, then there may be no substantial burden.  But under RFRA case law, if the plaintiffs are themselves compelled or pressured by threat of punitive fines to: 1) themselves take or forbear from an action; and 2) it is their own action or forbearance that they find religiously offensive, there is a substantial burden.

The plaintiffs have demonstrated that the mandate and accommodation will compel them to engage in an affirmative act and that they find this act — their own act — to be religiously offensive.  That act is completing and providing to their issuer or TPA the self-certification forms.  The act of self-certification does more than simply state the organization's religious objection to covering or paying for its employees to get emergency contraception.  The self-certification act designates the organization's TPA as the TPA for contraception coverage.  The act tells the TPA or issuer that it must provide the organization's employees coverage that gives those employees free access to emergency contractive devices and products.  That act tells the TPA or issuer that it must notify the employees of that benefit.

The government argues that the plaintiffs were previously telling their TPAs or issuers not to provide coverage for emergency contraception and were previously declaring their religious objection to such devices and products, in a variety of ways.  At least one court has found that  the self-certification form does not require the religious organizations to do anything they were not already doing.  *See Priests for Life,* 2013 WL 6672400 (D.D.C. Dec. 19, 2013).  But the self-

certification form requires the organizations to do much more than simply protest or object.  The purpose of the form is to enable the provision of the very contraceptive services to the organization's employees that the organization finds abhorrent.  The form designates the organization's chosen TPA as the administrator for such benefits and requires the organization's chosen issuer or TPA to pay for the religiously offensive contraceptive services.  The purpose and effect of the form is to accomplish what the organization finds religiously forbidden and protests.  If the organizations do not act in the way the accommodation requires, they face onerous fines.  On January 1, 2014, the plaintiffs will be compelled or pressured to do something that they did not have to do on December 31, 2013.

The answer to the first question—does the accommodation compel or pressure the plaintiff religious organizations themselves to perform an act that they were not already doing— is clearly yes.

Citing *Kaemmerling* and *Thomas*, the government contends that RFRA is "a shield, not a sword" and that the plaintiffs cannot decide "what does and does not impose a substantial burden" on their beliefs.  Those cases do not stand for such a robust proposition.  Kaemmerling did not have to modify his behavior by engaging in an act he found religiously offensive.   The plaintiff organizations do.  *Thomas* instructs courts that it is the plaintiffs' decision on whether the acts they are required to engage in are religiously offensive, and that the courts are not to take it on themselves to decide whether the plaintiffs' decision was objectively reasonable.  *See Thomas*, 450 U .S. at 715. The answer to the second question— do the plaintiffs find the self-certification they are required to do religiously offensive because it makes them complicit in providing their employees with free and ready access to emergency contraceptives – is also yes.

The government focuses on this second question, the role of the plaintiffs' own act in leading to the religiously offensive result, in arguing that the act of self-certifying is too attenuated from the provision of the contraceptive services to be a substantial burden.  "Cases that find a substantial burden," the government argues, "uniformly involve a direct burden on the plaintiff rather than a burden imposed on another entity."  One problem with this argument is that there is a burden on the plaintiffs, to fill out the self-certification form and comply with the related requirements, or pay a fine.  A second problem is the assumption that once the self-certification is completed, the plaintiffs' involvement ends, and that removes or insulates the plaintiffs from providing the emergency contraceptive services they find religiously objectionable.

As to the first problem, the case law supports the conclusion that the accommodation's imposition on the plaintiffs of a required act —self-certification—that they find religiously offensive, coerced or pressured by exposure to punitive fines, meets the substantial burden test.  The government's position that there is no direct burden imposed because the plaintiffs do not themselves have to arrange or pay for emergency contraceptives would require this court to make several inferences not supported by the case law.  RFRA case law does not allow a court to substitute its judgment on whether the act the plaintiffs are required or forbidden to perform is or is not religiously offensive.  *See Thomas*, 450 U .S. at 715.  It is insufficient to dismiss or discount the plaintiffs' religious objection to the act or forbearance based on the amount of work involved, as long as an act or forbearance on the plaintiffs' part is compelled or coerced by the government, including by the threat of large fines.  The fact that filling out the self-certification form will take little time or effort does not determine whether it is religiously offensive.  *See, e.g., Roman Catholic Archdiocese*, 2013 WL 6579764, at *13 ("This argument — which essentially reduces to the claim

that completing the self-certification places no burden on plaintiffs' religion because 'it's just a form'— finds no support in the case law.").

As to the second problem, the allegations and undisputed facts in the record fail to support the government's argument.   This is not a case in which the religiously offensive consequence—enabling free access to contraceptive devices and products—occurs only after, and independently of, any act or forbearance on the plaintiffs' part.  Contrary to the conclusion reached in *Priests for Life*, 2013 WL 6672400 (D.D.C. Dec. 19, 2013), the plaintiffs' self-certification and the group health plans they put into place are necessary to their employees' obtaining the free access to the contraceptives that the plaintiffs find religiously abhorrent.  The plaintiffs' acts are not sufficient for their employees to achieve this access, but the plaintiffs' acts are necessary to this result, and that is enough for RFRA.

The plaintiffs admit that the analysis would be different if the only acts that followed their self-certification were the acts of their employees seeking free access to emergency contraception. If, for example, the only consequence of self-certification was that employees had to go to a government clinic that dispensed free emergency contraception, there would be no substantial burden on the plaintiffs.  The religiously offensive conduct would be independent acts of third persons.  But under the accommodation, the plaintiffs' employees would obtain coverage and no-cost-sharing payments for emergency contraception only because the employees are otherwise covered by the plaintiffs' group health plan. The government has taken significant steps to separate this payment from the group health plan.  But the coverage and payment for employees to obtain emergency contraceptive products and devices is because those employees are covered by the group health plan that the plaintiffs put into place.  The coverage and payment occurs through the TPA the

plaintiffs contracted with and who they have been required to designate as the administrator for contraceptive services through the self-certification form, or through the plaintiffs' issuer.

Both the TPA and issuer provide coverage and payment because the plaintiffs self-certify their unwillingness to do so through the plan itself.  But the plaintiffs' employees can obtain such coverage and payment only as long as they are the plaintiffs' employees and on the plaintiffs' group health plan.  It is the insurance plan that the religious-organization employer put into place, the issuer or TPA the employer contracted with, and the self-certification form the employer completes and provides the issuer or TPA, that enable the employees to obtain the free access to the contraceptive devices that the plaintiffs find religiously offensive.

Even accepting that the government has succeeded in preventing any payment by the religious organization for the religiously offensive devices, there is a causal link between the acts the plaintiffs must do under the accommodation and the provision of contraceptive devices and products to employees on a no-cost-sharing basis.  The effort to accommodate the religious organizations by reducing their involvement in providing their employees with such access to emergency contraception did not end the plaintiffs' involvement so as to avoid required acts on their part that offend their faith.

The court finds and concludes that the plaintiffs have established that they will likely succeed in showing a substantial burden under RFRA.

### B.     A Compelling Interest and the Least Restrictive Means

RFRA states that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . .  is the least restrictive means of furthering [a] compelling governmental interest."  42 U.S.C. § 2000bb–1(b).  This "compelling

interest test" is described as applying "strict scrutiny."

The cases identify two interests the government asserts as compelling. The first is promoting public health. The second is ensuring equal access by women to health care services. The courts have consistently concluded that it is not enough under RFRA to identify "'broadly formulated interests" that justify the "general applicability of government mandates.'" *Hobby Lobby*, 423 F.3d at 1143 (quoting *O'Centro*,546 U.S. at 431). Instead, a court must "'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (*O Centro*, 546 U.S. at 431). Under RFRA, it is not enough for the government to point to how the ACA as a whole may protect or promote public health. The issue is whether denying the limited religious exemption from emergency contraceptives that potentially prevent implantation of fertilized eggs to eligible institutions like plaintiffs would undermine a compelling interest in protecting health. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 431-32.

The government has not clearly shown how denying these plaintiffs an exemption from the mandate to pay for employees to have no-cost-sharing access to emergency contraceptives would undermine a compelling interest in protecting women's health.[8]   But even assuming that the

---

[8] Nor does the record justify finding a compelling interest based on the government's slippery-slope argument that if the exemption for religious employers were extended to these plaintiffs, the government would be unable to enforce the regulations effectively. That argument depends on a showing that uniformity is critical such that granting the requested exemptions would undermine effective administration. *See, e.g.*, *United States v. Lee*, 455 U.S. 252 (1982) (rejecting  a claimed exception to the obligation to pay Social Security taxes in part because "mandatory participation is indispensable to the fiscal vitality of the social security system" and that the "tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief."); *Hernandez v. Commissioner*, 490 U.S. 680, 700 (1989).   There are two problems with applying this argument to the religious exemption the plaintiffs seek. First, there are many secular and religious exemptions already built

government has shown a compelling interest in preventing unwanted pregnancies and related health problems and in making emergency contraceptive devices readily available to as many women as possible because these devices are particularly effective in addressing specific health problems (such as effective post-intercourse pregnancy prevention when pre-intercourse drugs, devices, or products are medically contraindicated or ineffective), the government is also required to show that it has adopted the "least restrictive means" of serving that interest than the mandate-and-accommodation provides.  Similarly, assuming that the government may be able to show a compelling interest in preventing sex discrimination in the provision of health care, the government must then show that the mandate-and-accommodation are the least restrictive means of meeting that interest.

The courts have identified several "less restrictive means" of serving the interests the government has identified than a total denial of the religious exemption request.   One is to have the government provide the contraceptive services or coverage directly to those who want them but cannot get them from their religious-organization employers.  *See, e.g., Korte*, 735 F.3d at 686.  If the numbers seeking such services is small because of the organizations' emphasis on hiring

---

into the ACA.  Although the government justifies each, such as the exemptions for grandfathered plans and for statutorily defined religious employers (as opposed to religious nonprofit organizations), the number of exemptions seems inconsistent with a showing that granting the exemption the plaintiffs seek would undermine administrative efficacy.  This is different from holding, as some courts have, that the existence of secular exemptions, such as for grandfathered plans or for small employers, undermines the government's ability to show that it is protecting a compelling interest in refusing an additional, religious exemption.  *See, e.g., Korte*, 735 F.3d at 686; *Gilardi*, 733 F.3d at 1222-23.  The fact that there are other exemptions does not in itself preclude the government from being able to show a compelling interest in applying the law to a particular religious organization or claimant.  The point here is that if the government is opposing a RFRA exemption by asserting a general need for uniformity, the existence of a number of exemptions makes that more difficult.

More important, the government's argument for uniformity does not depend on any specific showing relating to the ACA or the accommodation.  Rather, it is based on general slippery-slope concerns that could be raised in response to any RFRA claim to an exception to a generally applicable law.  Categorically relying on a need for uniformity is not sufficient under RFRA, but it is what the government has done here.

employees who subscribe to the same religious beliefs, the added tax consequence to the public from the religious-organization employers' refusal to pay would also be reduced.  *See Lee*, 455 U.S. at 252 (rejecting a religious exemption from the tax laws on the basis that it would be too burdensome on taxpayers generally to pay taxes for those refusing to do so).  Another alternative would be to have the government work with third parties to provide emergency contraception without requiring the plaintiffs' active participation.  *Korte*, 735 F.3d at 686.  Still another alternative could be to have the employee self-certify on an as-needed basis that their employer is a religious nonprofit that does not provide coverage for such services.  The plaintiffs identify other possible means, such as providing tax credits to employees who have to purchase the emergency contraception.  The government has not explained why the mandate and accommodation is the least restrictive means of advancing a compelling government interest.

The result is to find and conclude that plaintiffs have shown both a substantial likelihood of succeeding on the merits of their claim that the mandate and accommodation substantially burden the plaintiffs' religious exercise and the absence of a genuine factual dispute material to this determination.  The government has failed to show that the mandate and accommodation are the least restrictive means of advancing a compelling government interest.

This result is neither simply reached nor one-sided in consequence.  Employees of religious organizations currently unable to claim the exemption, who do not share their employer's anti-contraception beliefs, will not receive the statutory benefit of emergency contraception coverage without cost-sharing.  Employees who need emergency contraceptives will face their own unhappy choice between paying costs they would not incur in the absence of the exemption or risking an unwanted pregnancy.  This burden and choice, which already exists for employees of religious

43

employers, would be extended to nonprofit religious organizations.  The ACLU as amicus argues that exempting the plaintiff organizations from the mandate and denying their employees emergency contraceptive coverage without cost sharing effectively imposes the plaintiffs' religious beliefs on nonbelieving employees and shifts the costs of the accommodation from accommodated believers to nonadherents and other third parties.  *See, e.g.*, *Sherbert*, 374 U.S. at 409; *see also Korte*, 735 F.3d at 719-20 (Rovner, J., dissenting).  To the extent this assumes that an employee would have an enforceable private right to ACA coverage, this is unclear.  And even recognizing the burden that granting the exemption imposes, it does not require employees to violate their own religious beliefs or abridge their religious liberties.  Nor does the existence and recognition of this burden relieve the government of showing that the mandate and accommodation are the least restrictive means of serving a compelling interest in avoiding the burden by giving employees free access to emergency contraceptives.

## V.     The Remaining Requirements for Injunctive Relief and Summary Judgment

### A.     Injunctive Relief

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quotation omitted).  The same is true for violations of RFRA; showing a likelihood of success on the merits shows irreparable injury.  *O Centro*, 389 F.3d 973, 995 (10th Cir. 2004), *aff'd*, *O'Centro*, 546 U.S. at 439 ("[The plaintiff] would certainly suffer an irreparable harm assuming of course that it is likely to succeed on the merits of its RFRA claim."); *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012); *Legatus v. Sebelius*, 901 F. Supp. 2d 980, 978 (E.D. Mich 2012).

The plaintiffs' injury outweighs the government's injury if an injunction is granted. Granting the injunction preserves the status quo, which the government has failed to show a compelling interest in changing. *See Roman Catholic Archdiocese*, 2013 WL 6579764 (citing *Cornish v. Dudas*, 540 F.Supp.2d 61, 65 (D.D.C.2008)); *see also Tyndale House Publishers*, 904 at 29–30 (D.D.C. 2012).

The public interest weighs in favor of granting the injunction. Protecting constitutional rights and the rights under RFRA are in the public's interest. "Congress [has] obligated itself to explicitly exempt later-enacted statutes from RFRA, which is conclusive evidence that RFRA trumps later federal statutes when RFRA has been violated." *Hobby Lobby*, 723 F.3d at 1114, 1146. This is why some have equated RFRA to a constitutional right. *Id.* Having decided not to explicitly exempt the ACA from RFRA, it is in the public's interest to enjoin the application of federal statutes that violate RFRA.

The plaintiffs are entitled to an injunction preventing the enforcement of the mandate and accommodation to them, their plans, their TPAs, and their issuers.

### B.    Summary Judgment

The plaintiffs have shown that, based on the undisputed facts in the record, the accommodation violates RFRA as a matter of law. The plaintiffs are entitled to summary judgment on their RFRA claims. The government's cross-motion for summary judgment on the absence of a RFRA violation is denied.

## VI.    Conclusion

The court grants the plaintiffs' motion for summary judgment on the RFRA claim and denies the government's cross-motion for summary-judgment on the RFRA claim. The court denies both

the plaintiffs' and government's cross-motions on the constitutional claims as moot and without prejudice.

The government is enjoined from applying or enforcing the regulations that require the plaintiffs, their health plans, TPAs, or issuers, to provide or execute the self-certification forms that enable or require the TPA or issuer to provide health insurance coverage for the plaintiffs' employees for FDA-approved emergency contraceptive devices, products, or services under the requirements imposed in 42 U.S.C. § 300gg-13(a)(4), Pub. L. 11-148, § 1563(e)-(f), as well as the application of the penalties found in 26 U.S.C. §§ 4980D & 4980H, and 29 U.S.C. § 1132.  An order of injunction will separately issue.

SIGNED on December 27, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge